GASPERINI *v.* CENTER FOR HUMANITIES, INC.

No. 95–719.   Argued April 16, 1996—Decided June 24, 1996

416

GINSBURG, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 439. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined, *post*, p. 448.

*Samuel A. Abady* argued the cause for petitioner. With him on the briefs were *Jonathan S. Abady, Matthew D. Brinckerhoff,* and *Andrew Dwyer.*

*Theodore B. Olson* argued the cause for respondent. With him on the brief were *Theodore J. Boutrous, Jr., Douglas R. Cox, Mark Snyderman,* and *Francis A. Montbach.**

JUSTICE GINSBURG delivered the opinion of the Court.

Under the law of New York, appellate courts are empowered to review the size of jury verdicts and to order new trials when the jury's award "deviates materially from what would be reasonable compensation." N. Y. Civ. Prac. Law and Rules (CPLR) § 5501(c) (McKinney 1995). Under the Seventh Amendment, which governs proceedings in federal court, but not in state court, "the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U. S. Const., Amdt. 7.

---

*Briefs of *amici curiae* urging reversal were filed for the Association of Trial Lawyers of America by *Jeffrey Robert White* and *Pamela A. Liapakis;* for the Picture Agency Council of America, Inc. (PACA), by *Nancy E. Wolff;* and for Federal Jurisdiction and Legal History Scholars Akhil Reed Amar et al. by *Arthur F. McEvoy* pro se, *Arthur R. Miller* pro se, *Daniel R. Coquillette* pro se, *Kenneth J. Chesebro, Arthur H. Bryant, William A. Rossbach,* and *Jonathan S. Massey.*

Briefs of *amici curiae* urging affirmance were filed for the City of New York by *Paul A. Crotty, Leonard J. Koerner,* and *Elizabeth S. Natrella;* for the American Council of Life Insurance et al. by *Patricia A. Dunn, Stephen J. Goodman, Phillip E. Stano,* and *Craig Berrington;* for the Chamber of Commerce of the United States et al. by *W. DeVier Pierson, Mark E. Greenwold, Clinton E. Cameron, Stephen A. Bokat,* and *Robin S. Conrad;* and for the Products Liability Advisory Council, Inc., by *Michael Hoenig* and *David B. Hamm.*

The compatibility of these provisions, in an action based on New York law but tried in federal court by reason of the parties' diverse citizenship, is the issue we confront in this case. We hold that New York's law controlling compensation awards for excessiveness or inadequacy can be given effect, without detriment to the Seventh Amendment, if the review standard set out in CPLR § 5501(c) is applied by the federal trial court judge, with appellate control of the trial court's ruling limited to review for "abuse of discretion."

## I

Petitioner William Gasperini, a journalist for CBS News and the Christian Science Monitor, began reporting on events in Central America in 1984. He earned his living primarily in radio and print media and only occasionally sold his photographic work. During the course of his seven-year stint in Central America, Gasperini took over 5,000 slide transparencies, depicting active war zones, political leaders, and scenes from daily life. In 1990, Gasperini agreed to supply his original color transparencies to The Center for Humanities, Inc. (Center) for use in an educational videotape, Conflict in Central America. Gasperini selected 300 of his slides for the Center; its videotape included 110 of them. The Center agreed to return the original transparencies, but upon the completion of the project, it could not find them.

Gasperini commenced suit in the United States District Court for the Southern District of New York, invoking the court's diversity jurisdiction pursuant to 28 U. S. C. § 1332.[1] He alleged several state-law claims for relief, including breach of contract, conversion, and negligence. See App. 5–6. The Center conceded liability for the lost transparencies and the issue of damages was tried before a jury.

---

[1] Plaintiff Gasperini, petitioner here, is a citizen of California; defendant Center, respondent here, is incorporated, and has its principal place of business, in New York.

At trial, Gasperini's expert witness testified that the "industry standard" within the photographic publishing community valued a lost transparency at $1,500. See *id.*, at 227. This industry standard, the expert explained, represented the average license fee a commercial photograph could earn over the full course of the photographer's copyright, *i. e.*, in Gasperini's case, his lifetime plus 50 years. See *id.*, at 228; see also 17 U. S. C. § 302(a). Gasperini estimated that his earnings from photography totaled just over $10,000 for the period from 1984 through 1993. He also testified that he intended to produce a book containing his best photographs from Central America. See App. 175.

After a three-day trial, the jury awarded Gasperini $450,000 in compensatory damages. This sum, the jury foreperson announced, "is [$]1500 each, for 300 slides." *Id.*, at 313. Moving for a new trial under Federal Rule of Civil Procedure 59, the Center attacked the verdict on various grounds, including excessiveness. Without comment, the District Court denied the motion. See App. to Pet. for Cert. 12a.

The Court of Appeals for the Second Circuit vacated the judgment entered on the jury's verdict. 66 F. 3d 427 (1995). Mindful that New York law governed the controversy, the Court of Appeals endeavored to apply CPLR § 5501(c), which instructs that, when a jury returns an itemized verdict, as the jury did in this case, the New York Appellate Division "shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." The Second Circuit's application of § 5501(c) as a check on the size of the jury's verdict followed Circuit precedent elaborated two weeks earlier in *Consorti* v. *Armstrong World Industries, Inc.*, 64 F. 3d 781, superseded, 72 F. 3d 1003 (1995). Surveying Appellate Division decisions that reviewed damage awards for lost transparencies, the Second Circuit concluded that testimony on industry standard alone was insufficient to justify a verdict; prime among other fac-

tors warranting consideration were the uniqueness of the slides' subject matter and the photographer's earning level.[2]

Guided by Appellate Division rulings, the Second Circuit held that the $450,000 verdict "materially deviates from what is reasonable compensation." 66 F. 3d, at 431. Some of Gasperini's transparencies, the Second Circuit recognized, were unique, notably those capturing combat situations in which Gasperini was the only photographer present. *Id.*, at 429. But others "depicted either generic scenes or events at which other professional photojournalists were present." *Id.*, at 431. No more than 50 slides merited a $1,500 award, the court concluded, after "[g]iving Gasperini every benefit of the doubt." *Ibid.* Absent evidence showing significant earnings from photographic endeavors or concrete plans to publish a book, the court further determined, any damage award above $100 each for the remaining slides would be excessive. Remittiturs "presen[t] difficult problems for appellate courts," the Second Circuit acknowledged, for court of appeals judges review the evidence from "a cold paper record." *Ibid.* Nevertheless, the Second Circuit set aside the $450,000 verdict and ordered a new trial, unless Gasperini agreed to an award of $100,000.

---

[2] See *Blackman* v. *Michael Friedman Publishing Group, Inc.*, 201 App. Div. 2d 328, 328–329, 607 N. Y. S. 2d 43, 44 (1st Dept. 1994) (award reduced from $1,000 to $400 per transparency in the absence of evidence to establish uniqueness); *Nierenberg* v. *Wursteria, Inc.*, 189 App. Div. 2d 571, 571–572, 592 N. Y. S. 2d 27, 27–28 (1st Dept. 1993) (award reduced from $1,500 to $500 per slide because evidence showed photographer earned little from slide sales); *Alen MacWeeney, Inc.* v. *Esquire Assocs.*, 176 App. Div. 2d 217, 218; 574 N. Y. S. 2d 340, 341 (1st Dept. 1991) (award reduced from $1,500 to $159 per transparency because evidence indicated that images were generic; court distinguished prior ruling in *Girard Studio Group, Ltd.* v. *Young & Rubicam, Inc.*, 147 App. Div. 2d 357, 536 N. Y. S. 2d 790 (1st Dept. 1989), permitting an award reduced from $3,000 to $1,500 per slide where evidence showed that "the lost slides represented classics from a long career").

This case presents an important question regarding the standard a federal court uses to measure the alleged excessiveness of a jury's verdict in an action for damages based on state law. We therefore granted certiorari. 516 U. S. 1086 (1996).

## II

Before 1986, state and federal courts in New York generally invoked the same judge-made formulation in responding to excessiveness attacks on jury verdicts: courts would not disturb an award unless the amount was so exorbitant that it "shocked the conscience of the court." See *Consorti*, 72 F. 3d, at 1012–1013 (collecting cases). As described by the Second Circuit:

> "The standard for determining excessiveness and the appropriateness of remittitur in New York is somewhat ambiguous. Prior to 1986, New York law employed the same standard as the federal courts, *see Matthews* v. *CTI Container Transport Int'l Inc.*, 871 F. 2d 270, 278 (2d Cir. 1989), which authorized remittitur only if the jury's verdict was so excessive that it 'shocked the conscience of the court.'" *Id.*, at 1012.

See also D. Siegel, Practice Commentaries C5501:10, reprinted in 7B McKinney's Consolidated Laws of New York Ann., p. 25 (1995) ("conventional standard for altering the verdict was that its sum was so great or so small that it 'shocked the conscience' of the court").

In both state and federal courts, trial judges made the excessiveness assessment in the first instance, and appellate judges ordinarily deferred to the trial court's judgment. See, *e. g., McAllister* v. *Adam Packing Corp.*, 66 App. Div. 2d 975, 976, 412 N. Y. S. 2d 50, 52 (3d Dept. 1978) ("The trial court's determination as to the adequacy of the jury verdict will only be disturbed by an appellate court where it can be said that the trial court's exercise of discretion was not reasonably grounded."); *Martell* v. *Boardwalk Enterprises,*

*Inc.,* 748 F. 2d 740, 750 (CA2 1984) ("The trial court's refusal to set aside or reduce a jury award will be overturned only for abuse of discretion.").

In 1986, as part of a series of tort reform measures,[3] New York codified a standard for judicial review of the size of jury awards. Placed in CPLR § 5501(c), the prescription reads:

> "In reviewing a money judgment . . . in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation."[4]

As stated in Legislative Findings and Declarations accompanying New York's adoption of the "deviates materially" formulation, the lawmakers found the "shock the conscience" test an insufficient check on damage awards; the legislature therefore installed a standard "invit[ing] more careful appellate scrutiny." Ch. 266, 1986 N. Y. Laws 470 (McKinney). At the same time, the legislature instructed the Appellate Division, in amended § 5522, to state the reasons for the court's rulings on the size of verdicts, and the factors the

---

[3] The legislature sought, particularly, to curtail medical and dental malpractice, and to contain "already high malpractice premiums." Legislative Findings and Declaration, Ch. 266, 1986 N. Y. Laws 470 (McKinney).

[4] In full, CPLR § 5501(c) provides:

"The appellate division shall review questions of law and questions of fact on an appeal from a judgment or order of a court of original instance and on an appeal from an order of the supreme court, a county court or an appellate term determining an appeal. In reviewing a money judgment in an action in which an itemized verdict is required by rule forty-one hundred eleven of this chapter in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation."

court considered in complying with § 5501(c).[5]   In his signing statement, then-Governor Mario Cuomo emphasized that the CPLR amendments were meant to rachet up the review standard: "This will assure greater scrutiny of the amount of verdicts and promote greater stability in the tort system and greater fairness for similarly situated defendants throughout the State." Memorandum on Approving L. 1986, Ch. 682, 1986 N. Y. Laws, at 3184; see also Newman & Ahmuty, Appellate Review of Punitive Damage Awards, in Insurance, Excess, and Reinsurance Coverage Disputes 1990, p. 409 (B. Ostrager & T. Newman eds. 1990) (review standard prescribed in § 5501(c) "was intended to . . . encourage Appellate Division modification of excessive awards").

New York state-court opinions confirm that § 5501(c)'s "deviates materially" standard calls for closer surveillance than "shock the conscience" oversight. See, *e. g., O'Connor* v. *Graziosi,* 131 App. Div. 2d 553, 554, 516 N. Y. S. 2d 276, 277 (2d Dept. 1987) ("apparent intent" of 1986 legislation was "to facilitate appellate changes in verdicts"); *Harvey* v. *Mazal American Partners,* 79 N. Y. 2d 218, 225, 590 N. E. 2d 224, 228 (1992) (instructing Appellate Division to use, in setting remittitur, only the "deviates materially" standard, and not the "shock the conscience" test); see also *Consorti,* 72 F. 3d, at 1013 ("Material deviation from reasonableness is less than that deviation required to find an award so excessive as to 'shock the conscience.'"); 7 J. Weinstein, H. Korn, & A. Miller, New York Civil Practice ¶ 5501.21, p. 55–64 (1995) ("Under [§ 5501(c)'s] new standard, the reviewing court is given greater power to review the size of a jury award than had heretofore been afforded . . . .").

---

[5] CPLR § 5522(b) provides:

"In an appeal from a money judgment in an action . . . in which it is contended that the award is excessive or inadequate, the appellate division shall set forth in its decision the reasons therefor, including the factors it considered in complying with subdivision (c) of section fifty-five hundred one of this chapter."

Although phrased as a direction to New York's intermediate appellate courts, § 5501(c)'s "deviates materially" standard, as construed by New York's courts, instructs state trial judges as well. See, *e. g., Inya* v. *Ide Hyundai, Inc.*, 209 App. Div. 2d 1015, 619 N. Y. S. 2d 440 (4th Dept. 1994) (error for trial court to apply "shock the conscience" test to motion to set aside damages; proper standard is whether award "materially deviates from what would be reasonable compensation"); *Cochetti* v. *Gralow*, 192 App. Div. 2d 974, 975, 597 N. Y. S. 2d 234, 235 (3d Dept. 1993) ("settled law" that trial courts conduct "materially deviates" inquiry); *Shurgan* v. *Tedesco*, 179 App. Div. 2d 805, 806, 578 N. Y. S. 2d 658, 659 (2d Dept. 1992) (approving trial court's application of "materially deviates" standard); see also *Lightfoot* v. *Union Carbide Corp.*, 901 F. Supp. 166, 169 (SDNY 1995) (CPLR 5501(c)'s "materially deviates" standard "is pretty well established as applicable to [state] trial and appellate courts."). Application of § 5501(c) at the trial level is key to this case.

To determine whether an award "deviates materially from what would be reasonable compensation," New York state courts look to awards approved in similar cases. See, *e. g., Leon* v. *J & M Peppe Realty Corp.*, 190 App. Div. 2d 400, 416, 596 N. Y. S. 2d 380, 389 (1st Dept. 1993) ("These awards . . . are not out of line with recent awards sustained by appellate courts."); *Johnston* v. *Joyce*, 192 App. Div. 2d 1124, 1125, 596 N. Y. S. 2d 625, 626 (4th Dept. 1993) (reducing award to maximum amount previously allowed for similar type of harm). Under New York's former "shock the conscience" test, courts also referred to analogous cases. See, *e. g., Senko* v. *Fonda*, 53 App. Div. 2d 638, 639, 384 N. Y. S. 2d 849, 851 (2d Dept. 1976). The "deviates materially" standard, however, in design and operation, influences outcomes by tightening the range of tolerable awards. See, *e. g., Consorti*, 72 F. 3d, at 1013, and n. 10, 1014–1015, and n. 14.

## III

In cases like Gasperini's, in which New York law governs the claims for relief, does New York law also supply the test for federal-court review of the size of the verdict? The Center answers yes. The "deviates materially" standard, it argues, is a substantive standard that must be applied by federal appellate courts in diversity cases. The Second Circuit agreed. See 66 F. 3d, at 430; see also *Consorti*, 72 F. 3d, at 1011 ("[CPLR § 5501(c)] is the substantive rule provided by New York law."). Gasperini, emphasizing that § 5501(c) trains on the New York Appellate Division, characterizes the provision as procedural, an allocation of decisionmaking authority regarding damages, not a hard cap on the amount recoverable. Correctly comprehended, Gasperini urges, § 5501(c)'s direction to the Appellate Division cannot be given effect by federal appellate courts without violating the Seventh Amendment's Reexamination Clause.

As the parties' arguments suggest, CPLR § 5501(c), appraised under *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), and decisions in *Erie*'s path, is both "substantive" and "procedural": "substantive" in that § 5501(c)'s "deviates materially" standard controls how much a plaintiff can be awarded; "procedural" in that § 5501(c) assigns decisionmaking authority to New York's Appellate Division. Parallel application of § 5501(c) at the federal appellate level would be out of sync with the federal system's division of trial and appellate court functions, an allocation weighted by the Seventh Amendment. The dispositive question, therefore, is whether federal courts can give effect to the substantive thrust of § 5501(c) without untoward alteration of the federal scheme for the trial and decision of civil cases.

### A

Federal diversity jurisdiction provides an alternative forum for the adjudication of state-created rights, but it does not carry with it generation of rules of substantive law. As

*Erie* read the Rules of Decision Act:[6] "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State." 304 U. S., at 78. Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.

Classification of a law as "substantive" or "procedural" for *Erie* purposes is sometimes a challenging endeavor.[7] *Guaranty Trust Co.* v. *York*, 326 U. S. 99 (1945), an early interpretation of *Erie*, propounded an "outcome-determination" test: "[D]oes it significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?" 326 U. S., at 109. Ordering application of a state statute of limitations to an equity proceeding in federal court, the Court said in *Guar-*

---

[6] Originally § 34 of the Judiciary Act of 1789, the Rules of Decision Act, now contained in 28 U. S. C. § 1652, reads: "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply."

[7] Concerning matters covered by the Federal Rules of Civil Procedure, the characterization question is usually unproblematic: It is settled that if the Rule in point is consonant with the Rules Enabling Act, 28 U. S. C. § 2072, and the Constitution, the Federal Rule applies regardless of contrary state law. See *Hanna* v. *Plumer*, 380 U. S. 460, 469–474 (1965); *Burlington Northern R. Co.* v. *Woods*, 480 U. S. 1, 4–5 (1987). Federal courts have interpreted the Federal Rules, however, with sensitivity to important state interests and regulatory policies. See, *e. g., Walker* v. *Armco Steel Corp.*, 446 U. S. 740, 750–752 (1980) (reaffirming decision in *Ragan* v. *Merchants Transfer & Warehouse Co.*, 337 U. S. 530 (1949), that state law rather than Rule 3 determines when a diversity action commences for the purposes of tolling the state statute of limitations; Rule 3 makes no reference to the tolling of state limitations, the Court observed, and accordingly found no "direct conflict"); *S. A. Healy Co.* v. *Milwaukee Metropolitan Sewerage Dist.*, 60 F. 3d 305, 310–312 (CA7 1995) (state provision for offers of settlement by plaintiffs is compatible with Federal Rule 68, which is limited to offers by defendants).

*anty Trust:* "[W]here a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Ibid.;* see also *Ragan* v. *Merchants Transfer & Warehouse Co.,* 337 U. S. 530, 533 (1949) (when local law that creates the cause of action qualifies it, "federal court must follow suit," for "a different measure of the cause of action in one court than in the other [would transgress] the principle of *Erie*"). A later pathmarking case, qualifying *Guaranty Trust,* explained that the "outcome-determination" test must not be applied mechanically to sweep in all manner of variations; instead, its application must be guided by "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna* v. *Plumer,* 380 U. S. 460, 468 (1965).

Informed by these decisions, we address the question whether New York's "deviates materially" standard, codified in CPLR § 5501(c), is outcome affective in this sense: Would "application of the [standard] . . . have so important an effect upon the fortunes of one or both of the litigants that failure to [apply] it would [unfairly discriminate against citizens of the forum State, or] be likely to cause a plaintiff to choose the federal court"? *Id.,* at 468, n. 9.[8]

We start from a point the parties do not debate. Gasperini acknowledges that a statutory cap on damages would supply substantive law *for Erie* purposes. See Reply Brief for

---

[8] *Hanna* keyed the question to *Erie's* "twin aims"; in full, *Hanna* instructed federal courts to ask "whether application of the [State's] rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court." 380 U. S., at 468, n. 9.

Petitioner 2 ("[T]he state as a matter of its substantive law may, among other things, eliminate the availability of damages for a particular claim entirely, limit the factors a jury may consider in determining damages, or place an absolute cap on the amount of damages available, and such substantive law would be applicable in a federal court sitting in diversity."); see also Tr. of Oral Arg. 4–5, 25; *Consorti*, 72 F. 3d, at 1011.[9]  Although CPLR § 5501(c) is less readily classified, it was designed to provide an analogous control.

New York's Legislature codified in § 5501(c) a new standard, one that requires closer court review than the common-law "shock the conscience" test.  See *supra*, at 422–423.  More rigorous comparative evaluations attend application of § 5501(c)'s "deviates materially" standard.  See *supra*, at 423–425.  To foster predictability, the legislature required the reviewing court, when overturning a verdict under § 5501(c), to state its reasons, including the factors it considered relevant.  See CPLR § 5522(b); *supra*, at 423–424.  We think it a fair conclusion that CPLR § 5501(c) differs from a statutory cap principally "in that the maximum amount recoverable is not set forth by statute, but rather is determined by case law."  Brief for City of New York as *Amicus Curiae* 11.  In sum, § 5501(c) contains a procedural instruction, see *supra*, at 426, but the State's objective is manifestly substantive.  Cf. *S. A. Healy Co.* v. *Milwaukee Metropolitan Sewerage Dist.*, 60 F. 3d 305, 310 (CA7 1995).

It thus appears that if federal courts ignore the change in the New York standard and persist in applying the "shock

---

[9] While we have not specifically addressed the issue, courts of appeals have held that district court application of state statutory caps in diversity cases, postverdict, does not violate the Seventh Amendment.  See *Davis* v. *Omitowoju*, 883 F. 2d 1155, 1161–1165 (CA3 1989) (Reexamination Clause of Seventh Amendment does not impede federal court's postverdict application of statutory cap); *Boyd* v. *Bulala*, 877 F. 2d 1191, 1196 (CA4 1989) (postverdict application of statutory cap does not violate Seventh Amendment right of trial by jury).

the conscience" test to damage awards on claims governed by New York law,[10] " 'substantial' variations between state and federal [money judgments]" may be expected. See *Hanna*, 380 U. S., at 467–468.[11] We therefore agree with the Second Circuit that New York's check on excessive damages implicates what we have called *Erie*'s "twin aims." See *supra*, at 428.[12] Just as the *Erie* principle precludes a federal court from giving a state-created claim "longer life . . . than [the claim] would have had in the state court," *Ragan,*

---

[10] JUSTICE SCALIA questions whether federal *district* courts in New York "actually appl[y]" or "*ought*" to apply the "shock the conscience" test in assessing a jury's award for excessiveness. *Post,* at 465–466 (collecting various formulations of review standard). If there is a federal district court standard, it must come from the Court of Appeals, not from the over 40 district court judges in the Southern District of New York, each of whom sits alone and renders decisions not binding on the others. Indeed, in *Ismail* v. *Cohen,* 899 F. 2d 183 (1990), the authority upon which JUSTICE SCALIA relies, the Second Circuit stated that district courts test damage awards for excessiveness under the "shock the conscience" standard. See *id.,* at 186 ("A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages."); see also *Scala* v. *Moore McCormack Lines, Inc.,* 985 F. 2d 680, 683 (CA2 1993) ("[I]n the federal courts, a judgment cannot stand where the damages awarded are so excessive as to shock the judicial conscience.") (internal quotation marks and citation omitted).

[11] JUSTICE SCALIA questions whether application of CPLR § 5501(c), in lieu of the standard generally used by federal courts within the Second Circuit, see *supra,* at 422, will in fact yield consistent outcome differentials, see *post,* at 465, 466. The numbers, as the Second Circuit believed, are revealing. See 66 F. 3d 427, 430 (1995). Is the difference between an award of $450,000 and $100,000, see *supra,* at 421, or between $1,500 per transparency and $500, see *supra,* at 421, n. 2, fairly described as insubstantial? We do not see how that can be so.

[12] For rights that are state created, state law governs the amount properly awarded as punitive damages, subject to an ultimate federal constitutional check for exorbitancy. See *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559, 568 (1996); *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.,* 492 U. S. 257, 278–279 (1989). An evenhanded approach would require federal-court deference to endeavors like New York's to control compensatory damages for excessiveness. See *infra,* at 435, n. 18.

337 U. S., at 533–534, so *Erie* precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court.

## B

CPLR § 5501(c), as earlier noted, see *supra*, at 425, 426, is phrased as a direction to the New York Appellate Division. Acting essentially as a surrogate for a New York appellate forum, the Court of Appeals reviewed Gasperini's award to determine if it "deviate[d] materially" from damage awards the Appellate Division permitted in similar circumstances. The Court of Appeals performed this task without benefit of an opinion from the District Court, which had denied "without comment" the Center's Rule 59 motion. 66 F. 3d, at 428. Concentrating on the authority § 5501(c) gives to the Appellate Division, Gasperini urges that the provision shifts fact-finding responsibility from the jury and the trial judge to the appellate court. Assigning such responsibility to an appellate court, he maintains, is incompatible with the Seventh Amendment's Reexamination Clause, and therefore, Gasperini concludes, § 5501(c) cannot be given effect in federal court. Brief for Petitioner 19–20. Although we reach a different conclusion than Gasperini, we agree that the Second Circuit did not attend to "[a]n essential characteristic of [the federal court] system," *Byrd* v. *Blue Ridge Rural Elec. Cooperative, Inc.*, 356 U. S. 525, 537 (1958), when it used § 5501(c) as "the standard for [federal] appellate review," *Consorti*, 72 F. 3d, at 1013; see also 66 F. 3d, at 430.

That "essential characteristic" was described in *Byrd*, a diversity suit for negligence in which a pivotal issue of fact would have been tried by a judge were the case in state court. The *Byrd* Court held that, despite the state practice,[13] the plaintiff was entitled to a jury trial in federal court.

---

[13] The defendant argued in *Byrd* that although the personal injury plaintiff was employed by an independent contractor, the work plaintiff was engaged to perform was the same as work done by defendant's own em-

In so ruling, the Court said that the *Guaranty Trust* "outcome-determination" test was an insufficient guide in cases presenting countervailing federal interests. See *Byrd,* 356 U. S., at 537. The Court described the counter-vailing federal interests present in *Byrd* this way:

> "The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury." *Ibid.* (footnote omitted).

The Seventh Amendment, which governs proceedings in federal court, but not in state court,[14] bears not only on the allocation of trial functions between judge and jury, the issue in *Byrd;* it also controls the allocation of authority to review verdicts, the issue of concern here. The Amendment reads:

> "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U. S. Const., Amdt. 7.

*Byrd* involved the first Clause of the Amendment, the "trial by jury" Clause. This case involves the second, the "re-examination" Clause. In keeping with the historic un-

---

ployees. Therefore, defendant maintained, the plaintiff ranked as a "statutory employee" whose sole remedy was under the State's workers' compensation law. The sameness of the work plaintiff and defendant's own employees performed presented a fact question, but in state court, a jury trial would not have been available to resolve it.

[14] See *Walker* v. *Sauvinet,* 92 U. S. 90, 92 (1876).

derstanding,[15] the Reexamination Clause does not inhibit the authority of trial judges to grant new trials "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. Rule Civ. Proc. 59(a). That authority is large. See 6A Moore's Federal Practice ¶ 59.05[2], pp. 59–44 to 59–46 (2d ed. 1996) ("The power of the English common law trial courts to grant a new trial for a variety of reasons with a view to the attainment of justice was well established prior to the establishment of our Government."); see also *Aetna Casualty & Surety Co.* v. *Yeatts*, 122 F. 2d 350, 353 (CA4 1941) ("The exercise of [the trial court's power to set aside the jury's verdict and grant a new trial] is not in derogation of the right of trial by jury but is one of the historic safeguards of that right."); *Blunt* v. *Little*, 3 F. Cas. 760, 761–762 (No. 1,578) (CC Mass. 1822) (Story, J.) ("[I]f it should clearly appear that the jury have committed a gross error, or have acted from improper motives, or have given damages excessive in relation to the person or the injury, it is as much the duty of the court to interfere, to prevent the wrong, as in any other case."). "The trial judge in the federal system," we have reaffirmed, "has . . . discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence." *Byrd*, 356 U. S., at 540. This discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur). See *Dimick* v. *Schiedt*, 293 U. S. 474, 486–487 (1935) (recognizing that remittitur withstands Seventh Amendment attack, but rejecting additur as unconstitutional).[16]

---

[15] See 6A Moore's Federal Practice ¶ 59.05[1], pp. 59–38 to 59–40 (2d ed. 1996) (common-law origin of trial court power to grant or deny a new trial).

[16] Inviting rethinking of the additur question on a later day, Justice Stone, joined by Chief Justice Hughes and Justices Brandeis and Cardozo, found nothing in the history or language of the Seventh Amendment forc-

In contrast, appellate review of a federal trial court's denial of a motion to set aside a jury's verdict as excessive is a relatively late, and less secure, development. Such review was once deemed inconsonant with the Seventh Amendment's Reexamination Clause. See, *e. g., Lincoln* v. *Power*, 151 U. S. 436, 437–438 (1894); *Williamson* v. *Osenton*, 220 F. 653, 655 (CA4 1915); see also 6A Moore's Federal Practice ¶ 59.08[6], at 59–167 (collecting cases). We subsequently recognized that, even in cases in which the *Erie* doctrine was not in play—cases arising wholly under federal law— the question was not settled; we twice granted certiorari to decide the unsettled issue, but ultimately resolved the cases on other grounds. See *Grunenthal* v. *Long Island R. Co.*, 393 U. S. 156, 158 (1968); *Neese* v. *Southern R. Co.*, 350 U. S. 77 (1955).[17]

Before today, we have not "expressly [held] that the Seventh Amendment allows appellate review of a district court's denial of a motion to set aside an award as excessive." *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 279, n. 25 (1989). But in successive reminders that the question was worthy of this Court's attention, we noted, without disapproval, that courts of appeals engage in review of district court excessiveness determina-

---

ing the "incongruous position" that "a federal trial court may deny a motion for a new trial where the plaintiff consents to decrease the judgment to a proper amount," but may not condition denial of the motion on "the defendant's consent to a comparable increase in the recovery." *Dimick* v. *Schiedt*, 293 U. S., at 495.

[17] Dissenting from the Court's professed refusal to answer the question presented in *Grunenthal* v. *Long Island R. Co.*, Justices Harlan and Stewart observed that in *Grunenthal* itself, this Court indeed had reviewed the refusal of the District Court to set aside a jury verdict for excessiveness. 393 U. S., at 163 (Harlan, J., dissenting); *id.*, at 164–165 (Stewart, J., dissenting). Justice Harlan commented: "Like my Brother STEWART, I am at an utter loss to understand how the Court manages to review the District Court's decision and find it proper while at the same time proclaiming that it has avoided decision of the issue whether appellate courts ever may review such actions." *Id.*, at 163.

tions, applying "abuse of discretion" as their standard. See *Grunenthal*, 393 U. S., at 159. We noted the Circuit decisions in point, *id.*, at 157, n. 3, and, in *Browning-Ferris*, we again referred to appellate court abuse-of-discretion review:

> "[T]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered. The court of appeals should then review the district court's determination under an abuse-of-discretion standard." 492 U. S., at 279.[18]

As the Second Circuit explained, appellate review for abuse of discretion is reconcilable with the Seventh Amendment as a control necessary and proper to the fair administration of justice: "We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law." *Dagnello* v. *Long Island R. Co.*, 289 F. 2d 797, 806 (CA2 1961) (quoted in *Grunenthal*, 393 U. S., at 159). All other Circuits agree. See, *e. g., Holmes* v. *Elgin, Joliet & Eastern R. Co.*, 18 F. 3d 1393, 1396 (CA7 1994); 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2820, p. 209 (2d ed. 1995) ("[E]very circuit has said that there are circumstances in which it can reverse the denial of a new trial if the size of the verdict seems to be too far out of line."); 6A Moore's Federal Practice

---

[18] *Browning-Ferris* concerned punitive damages. We agree with the Second Circuit, however, that "[f]or purposes of deciding whether state or federal law is applicable, the question whether an award of *compensatory* damages exceeds what is permitted by law is not materially different from the question whether an award of *punitive* damages exceeds what is permitted by law." *Consorti* v. *Armstrong World Industries, Inc.*, 72 F. 3d 1003, 1012 (1995).

¶ 59.08[6], at 59–177 to 59–185 (same).[19] We now approve this line of decisions, and thus make explicit what Justice Stewart thought implicit in our *Grunenthal* disposition: "[N]othing in the Seventh Amendment . . . precludes appellate review of the trial judge's denial of a motion to set aside [a jury verdict] as excessive." 393 U. S., at 164 (Stewart, J., dissenting) (internal quotation marks and footnote omitted).[20]

## C

In *Byrd*, the Court faced a one-or-the-other choice: trial by judge as in state court, or trial by jury according to the federal practice.[21] In the case before us, a choice of that

---

[19] JUSTICE SCALIA disagrees. Ready to "destroy the uniformity of federal practice" in this regard, cf. *post*, at 467, he would render a judgment described as "astonishing" by the very authority upon which he relies. Compare *post*, at 460, with 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2820, p. 212 (2d ed. 1995) ("it would be astonishing if the Court, which has passed up three opportunities to do so, should ultimately reject" the unanimously held view of the courts of appeals).

[20] If the meaning of the Seventh Amendment were fixed at 1791, our civil juries would remain, as they unquestionably were at common law, "twelve good men and true," 3 W. Blackstone, Commentaries *349; see *Capital Traction Co.* v. *Hof*, 174 U. S. 1, 13 (1899) ("'Trial by jury,' in the primary and usual sense of the term at the common law and in the American constitutions . . . is a trial by a jury of twelve men."). But see *Colgrove* v. *Battin*, 413 U. S. 149, 160 (1973) (six-member jury for civil trials satisfies Seventh Amendment's guarantee). Procedures we have regarded as compatible with the Seventh Amendment, although not in conformity with practice at common law when the Amendment was adopted, include new trials restricted to the determination of damages, *Gasoline Products Co.* v. *Champlin Refining Co.*, 283 U. S. 494 (1931), and Federal Rule of Civil Procedure 50(b)'s motion for judgment as a matter of law, see 9A C. Wright & A. Miller, Federal Practice and Procedure § 2522, pp. 244–246 (2d ed. 1995). See also *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322, 335–337 (1979) (issue preclusion absent mutuality of parties does not violate Seventh Amendment, although common law as it existed in 1791 permitted issue preclusion only when there was mutuality).

[21] The two-trial rule posited by JUSTICE SCALIA, *post*, at 467, surely would be incompatible with the existence of "[t]he federal system [as] an independent system for administering justice," *Byrd* v. *Blue Ridge Rural*

order is not required, for the principal state and federal interests can be accommodated. The Second Circuit correctly recognized that when New York substantive law governs a claim for relief, New York law and decisions guide the allowable damages. See 66 F. 3d, at 430; see also *Consorti,* 72 F. 3d, at 1011. But that court did not take into account the characteristic of the federal court system that caused us to reaffirm: "The proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts is . . . a matter of federal law." *Donovan* v. *Penn Shipping Co.,* 429 U. S. 648, 649 (1977) *(per curiam);* see also *Browning-Ferris,* 492 U. S., at 279 ("[T]he role of the district court is to determine whether the jury's verdict is within the confines set by state law . . . . The court of appeals should then review the district court's determination under an abuse-of-discretion standard.").

New York's dominant interest can be respected, without disrupting the federal system, once it is recognized that the federal district court is capable of performing the checking function, *i. e.,* that court can apply the State's "deviates materially" standard in line with New York case law evolving under CPLR § 5501(c).[22] We recall, in this regard, that the

---

*Elec. Cooperative, Inc.,* 356 U. S. 525, 537 (1958). We discern no disagreement on such examples among the many federal judges who have considered this case.

[22] JUSTICE SCALIA finds in Federal Rule of Civil Procedure 59 a "federal standard" for new trial motions in "'direct collision'" with, and "'leaving no room for the operation of,'" a state law like CPLR § 5501(c). *Post,* at 468 (quoting *Burlington Northern R. Co.,* 480 U. S., at 4–5). The relevant prescription, Rule 59(a), has remained unchanged since the adoption of the Federal Rules by this Court in 1937. 302 U. S. 783. Rule 59(a) is as encompassing as it is uncontroversial. It is indeed "Hornbook" law that a most usual ground for a Rule 59 motion is that "the damages are excessive." See C. Wright, Law of Federal Courts 676–677 (5th ed. 1994). Whether damages are excessive for the claim-in-suit must be governed by *some law.* And there is no candidate for that governance other than the law that gives rise to the claim for relief—here, the law of New York. See 28 U. S. C. §§ 2072(a) and (b) ("Supreme Court shall have the power to prescribe general rules of . . . procedure"; "[s]uch rules shall not abridge,

"deviates materially" standard serves as the guide to be applied in trial as well as appellate courts in New York. See *supra*, at 425.

Within the federal system, practical reasons combine with Seventh Amendment constraints to lodge in the district court, not the court of appeals, primary responsibility for application of § 5501(c)'s "deviates materially" check. Trial judges have the "unique opportunity to consider the evidence in the living courtroom context," *Taylor* v. *Washington Terminal Co.*, 409 F. 2d 145, 148 (CADC 1969), while appellate judges see only the "cold paper record," 66 F. 3d, at 431.

District court applications of the "deviates materially" standard would be subject to appellate review under the standard the Circuits now employ when inadequacy or excessiveness is asserted on appeal: abuse of discretion. See 11 Wright & Miller, Federal Practice and Procedure § 2820, at 212–214, and n. 24 (collecting cases); see 6A Moore's Federal Practice ¶ 59.08[6], at 59–177 to 59–185 (same). In light of *Erie*'s doctrine, the federal appeals court must be guided by the damage-control standard state law supplies,[23] but as the Second Circuit itself has said: "If we reverse, it must be because of an abuse of discretion. . . . The very nature of the problem counsels restraint. . . . We must give the benefit of

---

enlarge or modify any substantive right"); *Browning-Ferris*, 492 U. S., at 279 ("standard of excessiveness" is a "matte[r] of state, and not federal, common law"); see also R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 729–730 (4th ed. 1996) (observing that Court "has continued since [*Hanna* v. *Plumer*, 380 U. S. 460 (1965),] to interpret the federal rules to avoid conflict with important state regulatory policies," citing *Walker* v. *Armco Steel Corp.*, 446 U. S. 740 (1980)).

[23] If liability and damage-control rules are split apart here, as JUSTICE SCALIA says they must be to save the Seventh Amendment, then Gasperini's claim and others like it would be governed by a most curious "law." The sphinx-like, damage-determining law he would apply to this controversy has a state forepart, but a federal hindquarter. The beast may not be brutish, but there is little judgment in its creation.

every doubt to the judgment of the trial judge." *Dagnello*, 289 F. 2d, at 806.

## IV

It does not appear that the District Court checked the jury's verdict against the relevant New York decisions demanding more than "industry standard" testimony to support an award of the size the jury returned in this case. As the Court of Appeals recognized, see 66 F. 3d, at 429, the uniqueness of the photographs and the plaintiff's earnings as photographer—past and reasonably projected—are factors relevant to appraisal of the award. See, *e. g.*, *Blackman* v. *Michael Friedman Publishing Group, Inc.*, 201 App. Div. 2d 328, 607 N. Y. S. 2d 43, 44 (1st Dept. 1994); *Nierenberg* v. *Wursteria, Inc.*, 189 App. Div. 2d 571, 571–572, 592 N. Y. S. 2d 27, 27–28 (1st Dept. 1993). Accordingly, we vacate the judgment of the Court of Appeals and instruct that court to remand the case to the District Court so that the trial judge, revisiting his ruling on the new trial motion, may test the jury's verdict against CPLR § 5501(c)'s "deviates materially" standard.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

While I agree with most of the reasoning in the Court's opinion, I disagree with its disposition of the case. I would affirm the judgment of the Court of Appeals. I would also reject the suggestion that the Seventh Amendment limits the power of a federal appellate court sitting in diversity to decide whether a jury's award of damages exceeds a limit established by state law.

## I

The Court correctly explains why the 1986 enactment of § 5501(c) of the N. Y. Civ. Prac. Law and Rules (McKinney 1995) changed the substantive law of the State. A state-law ceiling on allowable damages, whether fixed by a dollar limit or by a standard that forbids any award that "deviates mate-

rially from what would be reasonable compensation," *ibid.*, is a substantive rule of decision that federal courts must apply in diversity cases governed by New York law.

I recognize that state rules of appellate procedure do not necessarily bind federal appellate courts. The majority persuasively shows, however, that New York has not merely adopted a new procedure for allocating the decisionmaking function between trial and appellate courts. *Ante*, at 422–425. Instead, New York courts have held that all jury awards, not only those reviewed on appeal, must conform to the requirement that they not "deviat[e] materially" from amounts awarded in like cases. *Ante*, at 425. That New York has chosen to tie its damages ceiling to awards traditionally recovered in similar cases, rather than to a legislatively determined but inflexible monetary sum, is none of our concern.

Given the nature of the state-law command, the Court of Appeals for the Second Circuit correctly concluded in *Consorti* v. *Armstrong World Industries, Inc.*, 64 F. 3d 781, superseded, 72 F. 3d 1003 (1995), that New York's excessiveness standard applies in federal court in diversity cases controlled by New York law. *Consorti* erred in basing that conclusion in part on the fact that a New York statute requires that State's appellate division to apply the standard, but it was nevertheless faithful to the Rules of Decision Act, as construed in *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), in holding that a state-law limitation on the size of a judgment could not be ignored.[1] Similarly, the Court of Appeals

---

[1] Because there is no conceivable conflict between Federal Rule of Civil Procedure 59 and the application of the New York damages limit, this case is controlled by *Erie* and the Rules of Decision Act, rather than by the Rules Enabling Act's limitation on federal procedural rules that conflict with state substantive rights. See Ely, The Irrepressible Myth of Erie, 87 Harv. L. Rev. 693, 698 (1974); see also *Sibbach* v. *Wilson & Co.*, 312 U. S. 1 (1941). The Rule does state that new trials may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States," but that hardly consti-

correctly followed Consorti in this case and considered whether the damages awarded materially deviated from damages awarded in similar cases. 66 F. 3d 427, 431 (CA2 1995). I endorse both opinions in these respects.

Although the majority agrees with the Court of Appeals that New York law establishes the size of the damages that may be awarded, it chooses to vacate and remand. The majority holds that a federal court of appeals should review for abuse of discretion a district court's decision to deny a motion for new trial based on a jury's excessive award. As a result, it concludes that the District Court should be given the opportunity to apply in the first instance the "deviates materially" standard that New York law imposes. Ante, at 439.

The District Court had its opportunity to consider the propriety of the jury's award, and it erred. The Court of Appeals has now corrected that error after "drawing all reasonable inferences in favor of" petitioner. 66 F. 3d, at 431. As there is no reason to suppose that the Court of Appeals has reached a conclusion with which the District Court could permissibly disagree on remand, I would not require the District Court to repeat a task that has already been well performed by the reviewing court. I therefore would affirm the judgment of the Court of Appeals.

## II

Although I have addressed the question presented as if our decision in Erie alone controlled its outcome, petitioner argues that the second clause of the Seventh Amendment, which states that "no fact tried by jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law," U. S. Const., Amdt. 7,

---

tutes a command that federal courts must always substitute federal limits on the size of judgments for those set by the several States in cases founded upon state-law causes of action. Even at the time of the Rule's adoption, federal courts were bound to apply state statutory law in such cases.

bars the procedure followed by the Court of Appeals. There is no merit to that position.

Early cases do state that the Reexamination Clause prohibits appellate review of excessive jury awards, but they do not foreclose the practice altogether. See, *e. g., Southern Railway-Carolina Div.* v. *Bennett*, 233 U. S. 80, 87 (1914) ("It may be admitted that if it were true that the excess appeared as [a] matter of law; that if, for instance, the statute fixed a maximum and the verdict exceeded it, a question might arise for this court"); 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2820, pp. 207–209 (2d ed. 1995). Indeed, for the last 30 years, we have consistently reserved the question whether the Constitution permits such review, *ante*, at 434–435, and, in the meantime, every Court of Appeals has agreed that the Seventh Amendment establishes no bar. 11 Wright & Miller § 2820, at 209.

Taking the question to be an open one, I start with certain basic principles. It is well settled that jury verdicts are not binding on either trial judges or appellate courts if they are unauthorized by law. A verdict may be insupportable as a matter of law either because of deficiencies in the evidence or because an award of damages is larger than permitted by law. If an award is excessive as a matter of law—in a diversity case if it is larger than applicable state law permits—a trial judge has a duty to set it aside. A failure to do so is an error of law that the court of appeals has a duty to correct on appeal.

These principles are sufficiently well established that no Seventh Amendment issue would arise if an appellate court ordered a new trial because a jury award exceeded a monetary cap on allowable damages. That New York has chosen to define its legal limit in less mathematical terms does not require a different constitutional conclusion.

New York's limitation requires a legal inquiry that cannot be wholly divorced from the facts, but that quality does not necessarily make the question one for the factfinder rather

than the reviewing court. Three times this Term we have assigned appellate courts the task of independently reviewing similarly mixed questions of law and fact. See *Ornelas* v. *United States*, 517 U. S. 690, 696–697 (1996); *Markman* v. *Westview Instruments, Inc.*, 517 U. S. 370, 388–390 (1996); *Thompson* v. *Keohane*, 516 U. S. 90, 112–116 (1995). Such appellate review is proper because mixed questions require courts to construe all record inferences in favor of the factfinder's decision and then to determine whether, on the facts as found below, the legal standard has been met. See *Ornelas*, 517 U. S., at 696–697 (quoting *Pullman-Standard* v. *Swint*, 456 U. S. 273, 289, n. 19 (1982)). In following that procedure here, the Court of Appeals did not reexamine any fact determined by a jury. 66 F. 3d, at 431. It merely identified that portion of the judgment that constitutes "unlawful excess." See *Dimick* v. *Schiedt*, 293 U. S. 474, 486 (1935).[2]

Even if review by the Court of Appeals implicates the Reexamination Clause, it was "according to the rules of the common law." U. S. Const., Amdt. 7. At common law, the trial judge sitting *nisi prius* recommended whether a judicial panel sitting en banc at Westminster should accept the jury's award. The en banc court then ruled on the motion for new trial and entered judgment. 11 Wright & Miller § 2819, at 203.

Petitioner correctly points out that under this procedure motions for new trial based on excessiveness were not technically subject to appellate review. Riddell, New Trial at the Common Law, 26 Yale L. J. 49, 57 (1916) ("It seems clear that in criminal as in civil cases, the trial Judge had not the

---

[2] I thus disagree with JUSTICE SCALIA's view that there is a separate federal standard to "determine whether the award exceeds what is lawful to such degree that it may be set aside by order for new trial or remittitur." *Post*, at 464. In my view, if an award "exceeds what is lawful," *ibid.*, legal error has occurred and may be corrected. Certainly *Dimick* does not premise a court's power to overturn an award that exceeds lawful limits on the degree of the excess.

power to grant a new trial, but that recourse must be had to 'the Court above'"); *id.*, at 60. However, because the *nisi prius* judge often did not serve on the en banc court, the "court above" was in essentially the same position as a modern court of appeals. It considered the legality of the jury's award in light of the trial judge's opinion, but without any firsthand knowledge of what had transpired below. See Blume, Review of Facts in Jury Cases—The Seventh Amendment, 20 J. Am. Jud. Soc. 130, 131 (1936).[3]

Petitioner also contends that at common law the en banc court could only grant a new trial if the trial judge so recommended. That contention is undermined by numerous cases in which the "court above" granted new trials without making any reference to the trial judge's view of the damages. See, *e. g.*, *Honda Motor Co.* v. *Oberg*, 512 U. S. 415, 422–425 (1994) (citing cases).[4] Moreover, early English cases repeatedly state that the power to order a new trial when the jury returned an excessive award rested with "the Court," rather than the judge below,[5] and Blackstone identifies excessive

---

[3] For that reason, JUSTICE SCALIA is wrong to contend that the court at Westminster acted in no more of an appellate fashion when it entertained motions for new trials in causes tried at bar than when it entertained them in causes tried at *nisi prius*. *Post*, at 456. In the former cases, the en banc court would entertain a motion for new trial after having heard the evidence itself. In the latter, it would sometimes entertain the motion only after having heard the report on the evidence of the *nisi prius* judge.

[4] Although *Honda* itself involved review of punitive damages awards, we expressly noted that there was no basis for suggesting "that different standards of judicial review were applied for punitive and compensatory damages before the 20th century," 512 U. S., at 422, n. 2. Indeed, many of the decisions we relied upon in *Honda* involved compensatory damages, and there is some authority to suggest that judicial review of the former has a more secure historical pedigree than does judicial review of the latter.

[5] See, *e. g.*, *Bright* v. *Eynon*, 1 Burr. 390, 97 Eng. Rep. 365, 368 (K. B. 1757) (Denison, J., concurring) ("[T]he granting a new trial, or refusing it, must depend upon the legal discretion of the Court; guided by the nature

damages as an independent basis on which the "court above" may grant a new trial but makes no mention of a requirement that the trial judge must so recommend. 3 W. Blackstone, Commentaries *387.

Even when read most favorably to petitioner, therefore, no meaningful distinction exists between the common-law practice by which the "court above" considered a new trial motion in the first instance, and the practice challenged here, by which an appellate court reviews a district court's ruling on a new trial motion. See Riddell, 26 Yale L. J., at 57. As Justice Stone explained, in a dissenting opinion joined by Chief Justice Hughes, Justice Brandeis, and Justice Cardozo:

> "[The Seventh Amendment], intended to endure for unnumbered generations, is concerned with substance and not with form. There is nothing in its history or language to suggest that the Amendment had any purpose but to preserve the essentials of the jury trial as it was known to the common law before the adoption of the Constitution. For that reason this Court has often refused to construe it as intended to perpetuate in changeless form the *minutiae* of trial practice as it existed in the English courts in 1791. From the beginning, its language has been regarded as but subservient to the single purpose of the Amendment, to preserve the essentials of the jury trial in actions at law, serving to distinguish them from suits in equity and admiralty, see *Parsons* v. *Bedford,* 3 Pet. 433, 446, and to safeguard the jury's function from any encroachment which the common law did not permit.

---

and circumstances of the particular case, and directed with a view to the attainment of justice"); *Wood* v. *Gunston,* Sty. 466, 82 Eng. Rep. 867 (K. B. 1655) ("It is in the discretion of the Court in some cases to grant a new tryal, but this must be a judicial, and not an arbitrary discretion, and it is frequent in our books for the Court to take notice of miscarriages of juries, and to grant new tryals upon them . . .").

"Thus interpreted, the Seventh Amendment guarantees that suitors in actions at law shall have the benefits of trial of issues of fact by a jury, but it does not prescribe any particular procedure by which these benefits shall be obtained, or forbid any which does not curtail the function of the jury to decide questions of fact as it did before the adoption of the Amendment. It does not restrict the court's control of the jury's verdict, as it had previously been exercised, and it does not confine the trial judge, in determining what issues are for the jury and what for the court, to the particular forms of trial practice in vogue in 1791." *Dimick* v. *Schiedt*, 293 U. S., at 490–491.

Because the Framers of the Seventh Amendment evinced no interest in subscribing to every procedural nicety of the notoriously complicated English system, see Henderson, The Background of the Seventh Amendment, 80 Harv. L. Rev. 289, 290 (1966), the common-law practice certainly does not demonstrate that the Reexamination Clause prohibits federal appellate courts from ensuring compliance with state-law limits on jury awards.

Nor does early and intricate English history justify the more limited assertion that federal appellate courts must be limited to a particular, highly deferential standard of excessiveness review. Common-law courts were hesitant to disturb jury awards, but less so in cases in which "a reasonably certain measure of damages is afforded." 1 D. Graham, Law of New Trials in Cases Civil and Criminal 452 (2d ed. 1855); Washington, Damages in Contract at Common Law, 47 L. Q. Rev. 345, 363–364 (1931).

Here, New York has prescribed an objective, legal limitation on damages. If an appellate court may reverse a jury's damages award when its own conscience has been shocked, 66 F. 3d, at 430, or its sense of justice outraged, *Dagnello* v. *Long Island R. Co.*, 289 F. 2d 797, 802 (CA2 1961); cf. *Honda Motor Co.* v. *Oberg*, 512 U. S., at 422–424 (citing English

cases), it may surely follow a sovereign's command that it do so when a jury has materially deviated from awards granted by other juries. If anything, the New York standard, though less deferential, is more certain.[6]

## III

For the reasons set forth above, I agree with the majority that the Reexamination Clause does not bar federal appellate courts from reviewing jury awards for excessiveness. I confess to some surprise, however, at its conclusion that "'the influence—if not the command—of the Seventh Amendment,'" *ante*, at 432 (quoting *Byrd* v. *Blue Ridge Rural Elec. Cooperative, Inc.*, 356 U. S. 525, 537 (1958) (footnote omitted)), requires federal courts of appeals to review district court applications of state-law excessiveness standards for an "abuse of discretion." *Ante*, at 438.

The majority's persuasive demonstration that New York law sets forth a substantive limitation on the size of jury awards seems to refute the contention that New York has merely asked appellate courts to reexamine facts. The majority's analysis would thus seem to undermine the conclusion that the Reexamination Clause is relevant to this case.

Certainly, our decision in *Byrd* does not make the Clause relevant. There, we considered only whether the Seventh Amendment's first clause should influence our decision to give effect to a state-law rule denying the right to a jury

---

[6] Our *per curiam* decision in *Donovan* v. *Penn Shipping Co.*, 429 U. S. 648 (1977), provides no support for the proposition that federal appellate courts are confined to a federal standard of excessiveness. That case held only that a plaintiff who had consented to a remittitur could not challenge its adequacy on appeal. *Id.*, at 649. Although we stated in dicta that "[t]he proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts is, however, a matter of federal law," *ibid.*, that broad statement was supported by citation to two cases, *Hanna* v. *Plumer*, 380 U. S. 460 (1965), and *Byrd* v. *Blue Ridge Rural Elec. Cooperative, Inc.*, 356 U. S. 525 (1958), which did not involve the review of jury awards.

altogether. 356 U. S., at 537. That holding in no way requires us to consult the Amendment's second clause to determine the standard of review for a district court's application of state substantive law.

My disagreement is tempered, however, because the majority carefully avoids defining too strictly the abuse-of-discretion standard it announces. To the extent that the majority relies only on "practical reasons" for its conclusion that the Court of Appeals should give some weight to the District Court's assessment in determining whether state substantive law has been properly applied, *ante*, at 438, I do not disagree with its analysis.

As a matter of federal-court administration, we have recognized in other contexts the need for according some deference to the lower court's resolution of legal, yet fact-intensive, questions. See *Ornelas* v. *United States*, 517 U. S., at 699; *Pierce* v. *Underwood*, 487 U. S. 552, 558, n. 1 (1988). Indeed, it is a familiar, if somewhat circular, maxim that deems an error of law an abuse of discretion.

In the end, therefore, my disagreement with the label that the majority attaches to the standard of appellate review should not obscure the far more fundamental point on which we agree. Whatever influence the Seventh Amendment may be said to exert, *Erie* requires federal appellate courts sitting in diversity to apply "the damage-control standard state law supplies." *Ante*, at 438.

## IV

Because I would affirm the judgment of the Court of Appeals, and because I do not agree that the Seventh Amendment in any respect influences the proper analysis of the question presented, I respectfully dissent.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

Today the Court overrules a longstanding and well-reasoned line of precedent that has for years prohibited fed-

eral appellate courts from reviewing refusals by district courts to set aside civil jury awards as contrary to the weight of the evidence. One reason is given for overruling these cases: that the Courts of Appeals have, for some time now, decided to ignore them. Such unreasoned capitulation to the nullification of what was long regarded as a core component of the Bill of Rights—the Seventh Amendment's prohibition on appellate reexamination of civil jury awards—is wrong. It is not for us, much less for the Courts of Appeals, to decide that the Seventh Amendment's restriction on federal-court review of jury findings has outlived its usefulness.

The Court also holds today that a state practice that relates to the division of duties between state judges and juries must be followed by federal courts in diversity cases. On this issue, too, our prior cases are directly to the contrary.

As I would reverse the judgment of the Court of Appeals, I respectfully dissent.

## I

Because the Court and I disagree as to the character of the review that is before us, I recount briefly the nature of the New York practice rule at issue. Section 5501(c) of the N. Y. Civ. Prac. Law and Rules (CPLR) (McKinney 1995) directs New York intermediate appellate courts faced with a claim "that the award is excessive or inadequate and that a new trial should have been granted" to determine whether the jury's award "deviates materially from what would be reasonable compensation." In granting respondent a new trial under this standard, the Court of Appeals necessarily engaged in a two-step process. As it has explained the application of §5501(c), that provision "requires the reviewing court to determine the range it regards as reasonable, and to determine whether the particular jury award deviates materially from that range." *Consorti* v. *Armstrong World Industries, Inc.*, 72 F. 3d 1003, 1013 (CA2 1995) (amended). The first of these two steps—the determination as to "rea-

sonable" damages—plainly requires the reviewing court to reexamine a factual matter tried by the jury: the appropriate measure of damages, on the evidence presented, under New York law. The second step—the determination as to the degree of difference between "reasonable" damages and the damages found by the jury (whether the latter "deviates materially" from the former)—establishes the degree of judicial tolerance for awards found not to be reasonable, whether at the trial level or by the appellate court. No part of this exercise is appropriate for a federal court of appeals, whether or not it is sitting in a diversity case.

### A

Granting appellate courts authority to decide whether an award is "excessive or inadequate" in the manner of CPLR § 5501(c) may reflect a sound understanding of the capacities of modern juries and trial judges. That is to say, the people of the State of New York may well be correct that such a rule contributes to a more just legal system. But the practice of *federal* appellate reexamination of facts found by a jury is precisely what the People of the several States considered *not* to be good legal policy in 1791. Indeed, so fearful were they of such a practice that they constitutionally prohibited it by means of the Seventh Amendment.

That Amendment was Congress's response to one of the principal objections to the proposed Constitution raised by the Anti-Federalists during the ratification debates: its failure to ensure the right to trial by jury in civil actions in federal court. The desire for an explicit constitutional guarantee against reexamination of jury findings was explained by Justice Story, sitting as Circuit Justice in 1812, as having been specifically prompted by Article III's conferral of "appellate Jurisdiction, both as to Law and Fact" upon the Supreme Court. "[O]ne of the most powerful objections urged against [the Constitution]," he recounted, was that this au-

thority "would enable that court, with or without a new jury, to re-examine the whole facts, which had been settled by a previous jury." *United States* v. *Wonson,* 28 F. Cas. 745, 750 (No. 16,750) (CC Mass.).[1]

The second clause of the Amendment responded to that concern by providing that "[i]n [s]uits at common law . . . no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U. S. Const., Amdt. 7. The Reexamination Clause put to rest "apprehensions" of "new trials by the appellate courts," *Wonson,* 28 F. Cas., at 750, by adopting, in broad fashion, "the rules of the common law" to govern federal-court interference with jury determinations.[2] The

---

[1] This objection was repeatedly made following the Constitutional Convention, see, *e. g.,* Martin, Genuine Information, in 3 Records of the Federal Convention of 1787, pp. 172, 221–222 (M. Farrand ed. 1911); Gerry, Reply to a Landholder, *id.,* at 298, 299, and at the ratifying conventions in the States, see, *e. g.,* 3 J. Elliot, Debates on the Federal Constitution 525, 540–541, 544–546 (1863) (Virginia Convention, statements of Mr. Mason and Mr. Henry); 4 *id.,* at 151, 154 (North Carolina Convention, statements of Mr. Bloodworth and Mr. Spencer).

Prior to adoption of the Amendment, these concerns were addressed by Congress in the Judiciary Act of 1789, 1 Stat. 73, which expressly directed, in providing for "reexamin[ation]" of civil judgments "upon a writ of error," that "there shall be no reversal in either [the Circuit or Supreme Court] . . . for any error of fact." § 22, 1 Stat. 84–85. That restriction remained in place until the 1948 revisions of the Judicial Code. See 62 Stat. 963, 28 U. S. C. § 2105 (1946 ed., Supp. II).

[2] The Amendment was relied upon at least twice to prevent actual new trials. In *Wonson* itself, Justice Story rejected the United States' claim of right to retry, on appeal, a matter unsuccessfully put before a jury in the District Court—notwithstanding acceptance of such a practice under local law. The court based its ruling on statutory grounds, but its interpretation of its statutory jurisdiction was dictated by its view that a contrary interpretation would contravene the Seventh Amendment. 28 F. Cas., at 750. And in *Justices* v. *Murray,* 9 Wall. 274, 281 (1870), this Court relied on *Wonson* in invalidating under the Seventh Amendment a federal habeas statute that provided for removal of certain judgments from state courts for purposes of retrial in federal court.

content of that law was familiar and fixed. See, *e. g., ibid.*
("[T]he common law here alluded to is not the common law
of any individual state, (for it probably differs in all), but it
is the common law of England, the grand reservoir of all our
jurisprudence"); *Dimick* v. *Schiedt,* 293 U. S. 474, 487 (1935)
(Seventh Amendment "in effect adopted the rules of the
common law, in respect of trial by jury, as these rules existed
in 1791"). It quite plainly barred reviewing courts from en-
tertaining claims that the jury's verdict was contrary to the
evidence.

At common law, review of judgments was had only on writ
of error, limited to questions of law. See, *e. g., Wonson,
supra,* at 748; 3 W. Blackstone, Commentaries on the Laws
of England 405 (1768) ("The writ of error only lies upon mat-
ter of *law* arising upon the face of the proceedings; so that
no evidence is required to substantiate or support it"); 1 W.
Holdsworth, History of English Law 213–214 (7th ed. 1956);
cf. *Ross* v. *Rittenhouse,* 2 Dall. 160, 163 (Pa. 1792) (McKean,
C. J.). That principle was expressly acknowledged by this
Court as governing federal practice in *Parsons* v. *Bedford,* 3
Pet. 433 (1830) (Story, J.). There, the Court held that no
error could be assigned to a district court's refusal to allow
transcription of witness testimony "to serve as a statement
of facts in case of appeal," notwithstanding the right to such
transcription under state practices made applicable to fed-
eral courts by Congress. *Id.,* at 443 (emphasis deleted).
This was so, the Court explained, because "[t]he whole ob-
ject" of the transcription was "to present the evidence here
in order to establish the error of the verdict in matters of
fact," *id.,* at 445—a mode of review simply unavailable on
writ of error, see *id.,* at 446, 448. The Court concluded that
Congress had not directed federal courts to follow state prac-
tices that would change "the effect or conclusiveness of the
verdict of the jury upon the facts litigated at the trial," *id.,*
at 449, because it had "the most serious doubts whether

[that] would not be unconstitutional" under the Seventh Amendment, *id.*, at 448.

> "This is a prohibition to the courts of the United States to re-examine any facts tried by a jury in any other manner. The only modes known to the common law to re-examine such facts, are the granting of a new trial by the court where the issue was tried, or to which the record was properly returnable; or the award of a venire facias de novo, by an appellate court, for some error of law which intervened in the proceedings.
>
> .    .    .    .    .
>
> "[I]f the evidence were now before us, it would not be competent for this court to reverse the judgment for any error in the verdict of the jury at the trial . . . ." *Id.*, at 447–449.

Nor was the common-law proscription on reexamination limited to review of the correctness of the jury's determination of liability on the facts. No less than the existence of liability, the proper measure of damages "involves only a question of fact," *St. Louis, I. M. & S. R. Co.* v. *Craft,* 237 U. S. 648, 661 (1915), as does a "motio[n] for a new trial based on the ground that the damages . . . are excessive," *Metropolitan R. Co.* v. *Moore,* 121 U. S. 558, 574 (1887). As appeals from denial of such motions necessarily pose a factual question, courts of the United States are constitutionally forbidden to entertain them.

> "No error of law appearing upon the record, this court cannot reverse the judgment because, upon examination of the evidence, we may be of the opinion that the jury should have returned a verdict for a less amount. If the jury acted upon a gross mistake of facts, or were governed by some improper influence or bias, the remedy therefore rested with the court below, under its gen-

eral power to set aside the verdict. . . . Whether [the refusal to exercise that power] was erroneous or not, our power is restricted by the Constitution to the determination of the questions of law arising upon the record. Our authority does not extend to a re-examination of facts which have been tried by the jury under instructions correctly defining the legal rights of parties. *Parsons* v. *Bedford, [supra]* . . . ." *Railroad Co.* v. *Fraloff,* 100 U. S. 24, 31–32 (1879).

This view was for long years not only unquestioned in our cases, but repeatedly affirmed.[3]

---

[3] See, *e. g., Wabash R. Co.* v. *McDaniels,* 107 U. S. 454, 456 (1883) ("That we are without authority to disturb the judgment upon the ground that the damages are excessive cannot be doubted. Whether the order overruling the motion for a new trial based upon that ground was erroneous or not, our power is restricted to the determination of questions of law arising upon the record. *Railroad Company* v. *Fraloff,* 100 U. S. 24 [(1879)]"); *Arkansas Valley Land & Cattle Co.* v. *Mann,* 130 U. S. 69, 75 (1889) ("[H]owever it was ascertained by the court that the verdict was too large . . . , the granting or refusing a new trial in a Circuit Court of the United States is not subject to review by this court") (citing *Parsons* v. *Bedford,* 3 Pet. 433 (1830); *Railroad Co.* v. *Fraloff,* 100 U. S. 24 (1879)); *Lincoln* v. *Power,* 151 U. S. 436, 437–438 (1894) ("[I]t is not permitted for this court, sitting as a court of errors, in a case wherein damages have been fixed by the verdict of a jury, to take notice of [a claim of excessive damages] where the complaint is only of the action of the jury. . . . [W]here there is no reason to complain of the instructions, an error of the jury in allowing an unreasonable amount is to be redressed by a motion for a new trial") (citing *Parsons, supra; Fraloff, supra*); *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 242–246 (1897); *Southern Railway-Carolina Div.* v. *Bennett,* 233 U. S. 80, 87 (1914) ("[A] case of mere excess upon the evidence is a matter to be dealt with by the trial court. It does not present a question for reexamination here upon a writ of error") (citing *Lincoln, supra*); *Fairmount Glass Works* v. *Cub Fork Coal Co.,* 287 U. S. 474, 481–482 (1933) ("The rule that this Court will not review the action of a federal trial court in granting or denying a motion for a new trial for error of fact has been settled by a long and unbroken line of decisions; and has been frequently applied where the ground of the motion was that the damages

## B

Respondent's principal response to these cases, which is endorsed by JUSTICE STEVENS, see *ante*, at 443–445, is that our forebears were simply wrong about the English common law. The rules of the common-law practice incorporated in the Seventh Amendment, it is claimed, did *not* prevent judges sitting in an appellate capacity from granting a new trial on the ground that an award was contrary to the weight of the evidence. This claim simply does not withstand examination of the actual practices of the courts at common law. The weight of the historical record strongly supports the view of the common law taken in our early cases.

At common law, all major civil actions were initiated before panels of judges sitting at the courts of Westminster. Trial was not always held at the bar of the court, however. The inconvenience of having jurors and witnesses travel to Westminster had given rise to the practice of allowing trials to be held in the countryside, before a single itinerant judge. This *nisi prius* trial, as it was called, was limited to the jury's deciding a matter of fact in dispute; once that was accomplished, the verdict was entered on the record which—along with any exceptions to the instructions or rulings of the *nisi prius* judge—was then returned to the en banc court at Westminster. See generally 1 Holdsworth, History of English Law, at 223–224, 278–282; G. Radcliffe & G. Cross, The English Legal System 90–91, 183–186 (3d ed. 1954). Requests for new trials were made not to the *nisi prius* judge, but to the en banc court, prior to further proceedings and entry of judgment. See 1 Holdsworth, *supra*, at 282; Riddell, New Trial at the Common Law, 26 Yale L. J. 49, 53, 57 (1916). Such motions were altogether separate from appeal on writ of error, which followed the entry of judg-

---

awarded by the jury were excessive or were inadequate" (footnotes omitted)).

ment.   1 Holdsworth, *supra*, at 213–214; Radcliffe & Cross, *supra*, at 210–212.[4]

Nonetheless, respondent argues, the role of the en banc court at Westminster was essentially that of an appellate body, reviewing the proceedings below; and those appellate judges *were* capable of examining the evidence, and of granting a new trial when, in their view, the verdict was contrary to the weight of the evidence.   See Blume, Review of Facts in Jury Cases—The Seventh Amendment, 20 J. Am. Jud. Soc. 130, 131 (1936); Riddell, *supra*, at 55–57, 60.   There are two difficulties with this argument.   The first is the characterization of the court at Westminster as an appellate body. The court's role with respect to the initiation of the action, the entertaining of motions for new trial, and the entry of judgment was the same in all cases—whether the cause was tried at the bar or at *nisi prius*.   To regard its actions in deciding a motion for a new trial as "appellate" in the latter instance supposes a functional distinction where none existed.   The second difficulty is that when the trial had been held at *nisi prius*, the judges of the en banc court apparently would order a new trial only if the *nisi prius* judge certified that he was dissatisfied with the verdict.   To be sure, there are many cases where no mention is made of the judge's certificate, but there are many indications that it was a required predicate to setting aside a verdict rendered at *nisi prius*, and respondent has been unable to identify a single case where a new trial was granted in the absence of such certification.   In short, it would seem that a new trial could not

---

[4] The grounds for granting a new trial were "want of notice of trial; or any flagrant misbehavior of the party prevailing towards the jury, which may have influenced their verdict; or any gross misbehavior of the jury among themselves: also if it appears by the judge's report, certified to the court, that the jury have brought in a verdict without or contrary to evidence, so that he is reasonably dissatisfied therewith; or if they have given exorbitant damages; or if the judge himself has misdirected the jury, so that they found an unjustifiable verdict."   3 W. Blackstone, Commentaries on the Laws of England 387 (1768) (footnotes omitted; emphases deleted).

be had except upon the approval of the judge who presided over the trial and heard the evidence.[5]

I am persuaded that our prior cases were correct that, at common law, "reexamination" of the facts found by a jury could be undertaken only by the trial court, and that appellate review was restricted to writ of error which could challenge the judgment only upon matters of law. Even if there were some doubt on the point, we should be hesitant to advance our view of the common law over that of our forbears, who were far better acquainted with the subject than we are. But in any event, the question of how to apply the "rules of the common law" to federal appellate consideration of mo-

---

[5] See *ibid.* (new trial would be granted "if it appears by the judge's report, certified to the court, that the jury have brought in a verdict without or contrary to evidence, so that he is reasonably dissatisfied therewith"). See, *e. g., Berks* v. *Mason,* Say. 264, 265, 96 Eng. Rep. 874, 874–875 (K. B. 1756); *Bright* v. *Eynon,* 1 Burr. 390, 97 Eng. Rep. 365 (K. B. 1757); see also Note, Limitations on Trial by Jury in Illinois, 19 Chi.-Kent L. Rev. 91, 92 (1940) ("An exhaustive examination of the early English cases has revealed not a single case where an English court at common law ever granted a new trial, as being against the evidence, unless the judge or judges who sat with the jury stated in open court, or certified, that the verdict was against the evidence and he was dissatisfied with the verdict").

JUSTICE STEVENS understands Blackstone to say that new trials were granted for *excessiveness* even where the *nisi prius* judge was not dissatisfied with the damages awarded, see *ante,* at 444–445. Blackstone's phrasing certainly allows for this reading, see n. 4, *supra,* but what indications we have suggest that the dissatisfaction of the presiding judge played the same role where the motion for new trial was based on a claim of excessive damages as where based on a claim of an erroneous verdict. See, *e. g., Boulsworth* v. *Pilkington,* Jones, T. 200, 84 Eng. Rep. 1216 (K. B. 1685); *Redshaw* v. *Brook,* 2 Wils. K. B. 405, 95 Eng. Rep. 887 (C. P. 1769); *Sharpe* v. *Brice,* 2 Black. W. 942, 96 Eng. Rep. 557 (C. P. 1774). The cases cited by JUSTICE STEVENS, *ante,* at 444–445, n. 5, are not at all to the contrary: In one, the case was tried at the bar of the court, so that there was no *nisi prius* judge, see *Wood* v. *Gunston,* Sty. 466, 82 Eng. Rep. 867 (K. B. 1655); in the other, the judge who had presided at trial was on the panel that ruled on the new trial motion, and recommended a new trial, see *Bright* v. *Eynon, supra,* at 390–391, 396–397, 97 Eng. Rep., at 365, 368.

tions for new trials is one that has already been clearly and categorically answered, by our precedents. As we said in *Dimick* v. *Schiedt,* 293 U. S. 474 (1935), in discussing the status of remittitur under "the rules of the common law," a doctrine that "has been accepted as the law for more than a hundred years and uniformly applied in the federal courts during that time" and "finds some support in the practice of the English courts prior to the adoption of the Constitution" will not lightly "be reconsidered or disturbed," *id.,* at 484–485. The time to question whether orders on motions for a new trial were in fact reviewable at common law has long since passed. Cases of this Court reaching back into the early 19th century establish that the Constitution forbids federal appellate courts to "reexamine" a fact found by the jury at trial; and that this prohibition encompasses review of a district court's refusal to set aside a verdict as contrary to the weight of the evidence.

## C

The Court, as is its wont of late, all but ignores the relevant history. It acknowledges that federal appellate review of district-court refusals to set aside jury awards as against the weight of the evidence was "once deemed inconsonant with the Seventh Amendment's Reexamination Clause," *ante,* at 434, but gives no indication of why ever we held that view; and its citation of only one of our cases subscribing to that proposition fails to convey how long and how clearly it was a fixture of federal practice, see *ibid.* (citing only *Lincoln* v. *Power,* 151 U. S. 436 (1894)). That our earlier cases are so poorly recounted is not surprising, however, given the scant analysis devoted to the conclusion that "appellate review for abuse of discretion is reconcilable with the Seventh Amendment," *ante,* at 435.

No precedent of this Court affirmatively supports that proposition. The cases upon which the Court relies neither

affirmed nor rejected the practice of appellate weight-of-the-evidence review that has been adopted by the courts of appeals—a development that, in light of our past cases, amounts to studied waywardness by the intermediate appellate bench. Our unaccountable reluctance, in *Grunenthal* v. *Long Island R. Co.*, 393 U. S. 156, 158 (1968), and *Neese* v. *Southern R. Co.*, 350 U. S. 77 (1955), to stand by our precedents, and the undeniable illogic of our disposition of those two cases—approving ourselves a district-court denial of a new trial motion, so as not to have to confront the lawfulness of reversal by the court of appeals—is authority of only the weakest and most negative sort. Nor can any weight be assigned to our statement in *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 279 (1989), seemingly approving appellate abuse-of-discretion review of denials of new trials where punitive damages are claimed to be excessive. *Browning-Ferris*, like *Grunenthal* and *Neese*, explicitly avoided the question that is before us today, see 492 U. S., at 279, n. 25. Even more significantly, *Browning-Ferris* involved review of a jury's *punitive* damages award. Unlike the measure of actual damages suffered, which presents a question of historical or predictive fact, see, *e. g.*, *Craft*, 237 U. S., at 661, the level of punitive damages is not really a "fact" "tried" by the jury. In none of our cases holding that the Reexamination Clause prevents federal appellate review of claims of excessive damages does it appear that the damages had a truly "punitive" component.

In any event, it is not *this* Court's statements that the Court puts forward as the basis for dispensing with our prior cases. Rather, it is the Courts of Appeals' unanimous "agree[ment]" that they may review trial-court refusals to set aside jury awards claimed to be against the weight of the evidence. *Ante*, at 435. This current unanimity is deemed controlling, notwithstanding the "relatively late" origin of the practice, *ante*, at 434, and without *any* inquiry into the

reasoning set forth in those Court of Appeals decisions.[6]
The Court contents itself with citations of two federal appellate cases and the assurances of two leading treatises that the view (however meager its intellectual provenance might be) is universally held. See *ante*, at 435–436. To its credit, one of those treatises describes the "dramatic change in doctrine" represented by appellate abuse-of-discretion review of denials of new trial orders generally as having been "accomplished by a blizzard of dicta" that, through repetition alone, has "given legitimacy to a doctrine of doubtful constitutionality." 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2819, pp. 200, 204 (2d ed. 1995).[7]

The Court's only suggestion as to what rationale might underlie approval of abuse-of-discretion review is to be found in a quotation from *Dagnello* v. *Long Island R. Co.*, 289 F. 2d 797 (CA2 1961), to the effect that review of denial of a new trial motion, if conducted under a sufficiently deferential standard, poses only "'a question of law.'" *Ante*, at 435 (quoting *Dagnello*, *supra*, at 806). But that is not the test that the Seventh Amendment sets forth. Whether or not it

---

[6] The Second Circuit, notwithstanding its practice with respect to excessiveness claims, will not review a district court's determination that the jury's liability ruling was supported by the weight of the evidence, see *Stonewall Ins. Co.* v. *Asbestos Claims Management*, 73 F. 3d 1178, 1199 (1995) (such a decision is "one of those few rulings that is simply unavailable for appellate review"), and the Eighth Circuit has questioned whether the Seventh Amendment permits appellate review of such determinations, see *Thongvanh* v. *Thalacker*, 17 F. 3d 256, 259–260 (1994); see also *White* v. *Pence*, 961 F. 2d 776, 782 (1992).

[7] I am at a loss to understand the Court's charge that keeping faith with our precedents—and requiring that the courts of appeals do likewise— would "'destroy the uniformity of federal practice,'" *ante*, at 436, n. 19. I had thought our decisions established uniformity. And as for commentators' observations that it would be "'astonishing'" for us actually to heed our precedents, see *ibid.*, quoting 11 Wright, Miller, & Kane, § 2820, at 212, they are no more than a prediction of inconstancy—which the Court today fulfills.

is possible to characterize an appeal of a denial of new trial as raising a "legal question," it is not possible to review such a claim without engaging in a "reexamin[ation]" of the "facts tried by the jury" in a manner "otherwise" than allowed at common law. Determining whether a particular award is excessive requires that one first determine the nature and extent of the harm—which undeniably requires reviewing the facts of the case. That the court's review also entails application of a legal standard (whether "shocks the conscience," "deviates materially," or some other) makes no difference, for what is necessarily *also* required is *reexamination of facts* found by the jury.

In the last analysis, the Court frankly abandons any pretense at faithfulness to the common law, suggesting that "the meaning" of the Reexamination Clause was not "fixed at 1791," *ante*, at 436, n. 20, contrary to the view that all our prior discussions of the Reexamination Clause have adopted, see *supra*, at 451–454. The Court believes we can ignore the very explicit command that "no fact tried by a jury shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law" because, after all, we have not insisted that juries be all male, or consist of 12 jurors, as they were at common law. *Ante*, at 436, n. 20. This is a desperate analogy, since there is of course no comparison between the specificity of the command of the Reexamination Clause and the specificity of the command that there be a "jury." The footnote abandonment of our traditional view of the Reexamination Clause is a major step indeed.[8]

---

[8] *Gasoline Products Co.* v. *Champlin Refining Co.*, 283 U. S. 494 (1931), is the only case cited in the Court's footnote that arguably involved the slightest departure from common-law practices regarding review of jury findings. It held, to be sure, that a new trial could be ordered on damages alone, even though at common law there was no practice of setting a verdict aside in part. But it did so only after satisfying itself that the change

## II

The Court's holding that federal courts of appeals may review district-court denials of motions for new trials for error of fact is not the only novel aspect of today's decision. The Court also directs that the case be remanded to the District Court, so that it may "test the jury's verdict against CPLR §5501(c)'s 'deviates materially' standard." *Ante,* at 439. This disposition contradicts the principle that "[t]he proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts is . . . a matter of federal law." *Donovan* v. *Penn Shipping Co.,* 429 U. S. 648, 649 (1977) *(per curiam).*

The Court acknowledges that state procedural rules cannot, as a general matter, be permitted to interfere with the allocation of functions in the federal court system, see *ante,* at 436–437. Indeed, it is at least partly for this reason that the Court rejects direct application of §5501(c) at the appellate level as inconsistent with an " 'essential characteristic' " of the federal court system—by which the Court presumably means abuse-of-discretion review of denials of motions for new trials. See *ante,* at 431, 437–438. But the scope of the Court's concern is oddly circumscribed. The "essential characteristic" of the federal jury, and, more specifically, the role of the federal trial court in reviewing jury judgments, apparently counts for little. The Court approves the "ac-

---

was one of "form" rather than "substance," quoting Lord Mansfield to the effect that " 'for form's sake, we must set aside the whole verdict.' " *Id.,* at 498 (quoting *Edie* v. *East India Co.,* 1 Black W. 295, 298, 96 Eng. Rep. 166, 167 (K. B. 1761)). It can hardly be maintained that whether or not a jury's damages award may be set aside on appeal is a matter of form. The footnote also cites 9A C. Wright & A. Miller, Federal Practice and Procedure §2522 (2d ed. 1995), for its discussion of Federal Rule of Civil Procedure 50(b), which permits post-trial motion for judgment as a matter of law. The Court neglects to mention that that discussion states: "The Supreme Court held that reservation of the decision in this fashion had been recognized at common law . . . ." *Id.,* §2522, at 245.

commodat[ion]" achieved by having district courts review jury verdicts under the "deviates materially" standard, because it regards that as a means of giving effect to the State's purposes "without disrupting the federal system," *ante*, at 437. But changing the standard by which trial judges review jury verdicts *does* disrupt the federal system, and is plainly inconsistent with the "strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal court." *Byrd* v. *Blue Ridge Rural Elec. Cooperative, Inc.*, 356 U. S. 525, 538 (1958).[9] The Court's opinion does not even acknowledge, let alone address, this dislocation.

We discussed precisely the point at issue here in *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257 (1989), and gave an answer altogether contrary to the one provided today. *Browning-Ferris* rejected a request to fashion a federal common-law rule limiting the size of punitive damages awards in federal courts, reaffirming the principle of *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), that "[i]n a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages . . . , and the factors the jury may consider in determining their amount, are questions of state law." 492 U. S., at 278. But the opinion expressly stated that "[f]ederal law . . . will control on those issues involving the proper review of the jury award by a federal district court and court of appeals." *Id.*, at 278–279. "In reviewing an award of punitive damages," it said, "the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Id.*, at 279. The same distinction necessarily applies where the

---

[9] Since I reject application of the New York standard on other grounds, I need not consider whether it constitutes "reexamination" of a jury's verdict in a manner "otherwise . . . than according to the rules of the common law."

judgment under review is for compensatory damages: State substantive law controls what injuries are compensable and in what amount; but federal standards determine whether the award exceeds what is lawful to such degree that it may be set aside by order for new trial or remittitur.[10]

The Court does not disavow those statements in *Browning-Ferris* (indeed, it does not even discuss them), but it presumably overrules them, at least where the state rule that governs "whether a new trial or remittitur should be ordered" is characterized as "substantive" in nature. That, at any rate, is the reason the Court asserts for giving § 5501(c) dispositive effect. The objective of that provision, the Court states, "is manifestly substantive," *ante*, at 429, since it operates to "contro[l] how much a plaintiff can be awarded" by "tightening the range of tolerable awards," *ante*, at 425, 426. Although "less readily classified" as substantive than "a statutory cap on damages," it nonetheless "was designed to provide an analogous control," *ante*, at 428, 429, by making a new trial mandatory when the award "deviat[es] materially" from what is reasonable, see *ante*, at 428–429.

I do not see how this can be so. It seems to me quite wrong to regard this provision as a "substantive" rule for *Erie* purposes. The "analog[y]" to "a statutory cap on damages," *ante*, at 428, 429, fails utterly. There is an absolutely fundamental distinction between a *rule of law* such as that, which would ordinarily be imposed upon the jury in the trial court's instructions, and a *rule of review*, which simply determines how closely the jury verdict will be scrutinized for

---

[10] JUSTICE STEVENS thinks that if an award "'exceeds what is lawful,'" the result is "legal error" that "may be corrected" by the appellate court. *Ante*, at 443, n. 2. But the sort of "legal error" involved here is the imposition of legal consequences (in this case, damages) in light of *facts* that, under the law, may not warrant them. To suggest that every fact may be reviewed, because what may ensue from an erroneous factual determination is a "legal error," is to destroy the notion that there is a factfinding function reserved to the jury.

compliance with the instructions. A tighter standard for reviewing jury determinations can no more plausibly be called a "substantive" disposition than can a tighter appellate standard for reviewing trial-court determinations. The one, like the other, provides additional assurance *that the law has been complied with;* but the other, like the one, *leaves the law unchanged.*

The Court commits the classic *Erie* mistake of regarding whatever changes the outcome as substantive, see *ante,* at 428–431. That is not the only factor to be considered. See *Byrd, supra,* at 537 ("[W]ere 'outcome' the only consideration, a strong case might appear for saying that the federal court should follow the state practice. But there are affirmative countervailing considerations at work here"). Outcome determination "was never intended to serve as a talisman," *Hanna* v. *Plumer,* 380 U. S. 460, 466–467 (1965), and does not have the power to convert the most classic elements of the *process* of assuring that the law is observed into the substantive law itself. The right to have a jury make the findings of fact, for example, is generally thought to favor plaintiffs, and that advantage is often thought significant enough to be the basis for forum selection. But no one would argue that *Erie* confers a right to a jury in federal court wherever state courts would provide it; or that, were it not for the Seventh Amendment, *Erie* would require federal courts to dispense with the jury whenever state courts do so.

In any event, the Court exaggerates the difference that the state standard will make. It concludes that different outcomes are likely to ensue depending on whether the law being applied is the state "deviates materially" standard of § 5501(c) or the "shocks the conscience" standard. See *ante,* at 429–430. Of course it is not the federal *appellate* standard but the federal *district-court* standard for granting new trials that must be compared with the New York standard to determine whether substantially different results will obtain—and it is far from clear that the district-court standard

*ought* to be "shocks the conscience." [11]   Indeed, it is not even clear (as the Court asserts) that "shocks the conscience" *is* the standard (erroneous or not) actually applied by the district courts of the Second Circuit.   The Second Circuit's test for reversing a grant of a new trial for an excessive verdict is whether the award was *"clearly* within the maximum limit of a reasonable range," *Ismail* v. *Cohen,* 899 F. 2d 183, 186 (CA2 1990) (internal quotation marks omitted), so any district court that uses that standard will be affirmed.   And while many district-court decisions express the "shocks the conscience" criterion, see, *e. g., Koerner* v. *Club Mediterranee, S. A.,* 833 F. Supp. 327, 333 (SDNY 1993), some have used a standard of "indisputably egregious," *Banff* v. *Express, Inc.,* 921 F. Supp. 1065, 1069 (SDNY 1995), or have adopted the inverse of the Second Circuit's test for reversing a grant of new trial, namely, *"clearly* outside the maximum limit of a reasonable range," *Paper Corp.* v. *Schoeller Technical Papers, Inc.,* 807 F. Supp. 337, 350–351 (SDNY 1992). Moreover, some decisions that *say* "shocks the conscience" in fact apply a rule much less stringent.   One case, for example, says that *any* award that would not be sustained under the New York "deviates materially" rule "shocks the conscience."   See *In re Joint Eastern & S. Dist. Asbestos Litigation,* 798 F. Supp. 925, 937 (E&SDNY 1992), rev'd on other grounds, 995 F. 2d 343, 346 (CA2 1993).   In sum, it is at least highly questionable whether the consistent outcome differential claimed by the Court even exists.   What seems to me far more likely to produce forum shopping is the consistent difference between the state and federal *appellate* standards, which the Court leaves untouched.   Under the Court's

---

[11] That the "shocks the conscience" standard was not the traditional one would seem clear from the opinion of Justice Story, quoted approvingly by the Court, *ante,* at 433, to the effect that remittitur should be granted "if it should clearly appear that the jury . . . have given damages excessive in relation to the person or the injury." *Blunt* v. *Little,* 3 F. Cas. 760, 761–762 (No. 1,578) (CC Mass. 1822).

disposition, the Second Circuit reviews only for abuse of discretion, whereas New York's appellate courts engage in a *de novo* review for material deviation, giving the defendant a double shot at getting the damages award set aside. The only result that would produce the conformity the Court erroneously believes *Erie* requires is the one adopted by the Second Circuit and rejected by the Court: *de novo* federal appellate review under the § 5501(c) standard.

To say that application of § 5501(c) in place of the federal standard will not consistently produce disparate results is not to suggest that the decision the Court has made today is not a momentous one. The *principle* that the state standard governs is of great importance, since it bears the potential to destroy the uniformity of federal practice and the integrity of the federal court system. Under the Court's view, a state rule that directed courts "to determine that an award is excessive or inadequate if it deviates *in any degree* from *the proper measure of compensation*" would have to be applied in federal courts, effectively requiring federal judges to determine the amount of damages *de novo*, and effectively taking the matter away from the jury entirely. Cf. *Byrd*, 356 U. S., at 537–538. Or consider a state rule that allowed the defendant a second trial on damages, with judgment ultimately in the amount of the lesser of two jury awards. Cf. *United States* v. *Wonson*, 28 F. Cas., at 747–748 (describing Massachusetts practice by which a second jury trial could be had on appeal). Under the reasoning of the Court's opinion, even such a rule as that would have to be applied in the federal courts.

The foregoing describes why I think the Court's *Erie* analysis is flawed. But in my view, one does not even reach the *Erie* question in this case. The standard to be applied by a district court in ruling on a motion for a new trial is set forth in Rule 59 of the Federal Rules of Civil Procedure, which provides that "[a] new trial may be granted ... for any of the reasons for which new trials have heretofore been granted in

actions at law *in the courts of the United States.*" (Emphasis added.) That is undeniably a federal standard.[12] Federal District Courts in the Second Circuit have interpreted that standard to permit the granting of new trials where " 'it is quite clear that the jury has reached a seriously erroneous result' " and letting the verdict stand would result in a " 'miscarriage of justice.' " *Koerner* v. *Club Mediterranee, S. A.,* *supra,* at 331 (quoting *Bevevino* v. *Saydjari,* 574 F. 2d 676, 684 (CA2 1978)). Assuming (as we have no reason to question) that this is a correct interpretation of what Rule 59 requires, it is undeniable that the Federal Rule is " 'sufficiently broad' to cause a 'direct collision' with the state law or, implicitly, to 'control the issue' before the court, thereby leaving no room for the operation of that law." *Burlington Northern R. Co.* v. *Woods,* 480 U. S. 1, 4–5 (1987). It is simply not possible to give controlling effect both to the federal standard and the state standard in reviewing the jury's award. That being so, the court has no choice but to apply the Federal Rule, which is an exercise of what we have called Congress's "power to regulate matters which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either," *Hanna,* 380 U. S., at 472.

*　　*　　*

There is no small irony in the Court's declaration today that appellate review of refusals to grant new trials for error of fact is "a control necessary and proper to the fair adminis-

---

[12] I agree with the Court's entire progression of reasoning in its footnote 22, *ante,* at 437, leading to the conclusion that *state* law must determine "[w]hether damages are excessive." But the question whether damages are excessive is quite separate from the question of when a jury award may be set aside for excessiveness. See *supra,* at 465. It is the latter that is governed by Rule 59; as *Browning-Ferris* said, district courts are "to determine, by reference to *federal standards developed under Rule 59,* whether a new trial or remittitur should be ordered," 492 U. S., at 279 (emphasis added).

tration of justice," *ante,* at 435.   It is objection to *precisely* that sort of "control" by federal appellate judges that gave birth to the Reexamination Clause of the Seventh Amendment.   Alas, those who drew the Amendment, and the citizens who approved it, did not envision an age in which the Constitution means whatever this Court thinks it ought to mean—or indeed, whatever the courts of appeals have recently thought it ought to mean.

When there is added to the revision of the Seventh Amendment the Court's precedent-setting disregard of Congress's instructions in Rule 59, one must conclude that this is a bad day for the Constitution's distinctive Article III courts in general, and for the role of the jury in those courts in particular.   I respectfully dissent.