317 F.3d 167
 Margo PRESLEY, Plaintiff-Appellant-Cross-Appellee,
v.
U.S. POSTAL SERVICE, Defendant,
GSA N.Y. Fleet Mgmt Ctr & Hector M. Martinez, Defendants-Cross-Defendants,
Apolinar A. Hernandez, Defendant-Cross-Claimant-Appellee-Cross-Appellant,
United States of America, Defendant-Cross-Defendant-Appellee.
 Docket No. 02-6135 (LEAD).
 Docket No. 02-6143(XAP).
 Docket No. 02-6165(CON).
 United States Court of Appeals, Second Circuit.
 Argued: December 11, 2002.
 Decided: January 10, 2003.
 
 COPYRIGHT MATERIAL OMITTED Timothy R. Capowski, Shaub, Ahmuty, Citrin & Spratt, LLP, Lake Success, N.Y. (Steven J. Ahmuty, Jr., Christopher Simone, of counsel), for plaintiff-appellant-cross-appellee Margo Presley.
 Evan H. Krinick, Rivkin Radler LLP, Uniondale, N.Y. (Cheryl F. Korman, Merril S. Biscone and Stuart M. Bodoff, of counsel), for defendant-cross-claimant-appellee-cross-appellant Apolinar Hernandez.
 Kevin P. Mulry, Assistant United States Attorney, Central Islip, N.Y. (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Deborah B. Zwany, Assistant United States Attorney, of counsel), for defendant-cross-defendant-appellee United States of America.
 Before: NEWMAN, SACK, and SOTOMAYOR, Circuit Judges.
 SOTOMAYOR, Circuit Judge.
 
 
 1
 Plaintiff-appellant-cross-appellee Margo Presley and defendant-cross-claimant-appellee-cross-appellant Apolinar Hernandez appeal from a judgment of the United States District Court for the Eastern District of New York (Roanne L. Mann, Magistrate Judge) in favor of Presley against the United States of America in the amount of $415,000 and against Hernandez in the amount of $1,795,000. This judgment followed a joint bench and jury trial on damages Presley sustained in a car accident involving a livery cab, in which she was riding, and a postal service vehicle.
 
 
 2
 Presley argues that the magistrate judge's award against the United States of $415,000 for her facial, back and neck injuries following the car accident is clearly erroneous in light of the undisturbed jury award of $1,795,000 in damages against the livery cab driver, Hernandez, for the same injuries. She also argues that several of the magistrate judge's findings of fact are erroneous, and that those factual findings influenced the magistrate judge's assessment of her credibility. On cross-appeal, Hernandez contends that the magistrate judge abused her discretion either by failing to rule on his motion for a new trial or remittitur of the jury verdict under Fed. R.Civ.P. 59 or by implicitly sustaining the verdict by entering judgment in the amount awarded by the jury.
 
 
 3
 For the reasons that follow, we vacate the amended judgment and remand for further consideration of Hernandez's motion for a new trial or remittitur. Because we conclude that several of the findings of fact relating to Presley's injuries are clearly erroneous and are uncertain to what extent these errors influenced the magistrate judge's damages award against the United States, we also vacate and remand for reconsideration of that award.
 
 BACKGROUND
 
 4
 I. Factual Background and Evidence Presented Below
 
 
 5
 Presley was injured in a car accident early in the morning on November 15, 1995, when the livery cab in which she was riding, which was driven by defendant Hernandez, collided with a U.S. Postal Service vehicle driven by Hector Martinez, a U.S. Postal Service employee who was on duty at the time. In the accident, Presley's nose was shattered and pushed inward by the impact. Presley also claims to have suffered neck and back injuries as a result of the collision.
 
 
 6
 Presley filed suit against the livery cab driver (Hernandez), the owner of the livery cab (GSA N.Y. Fleet Management Center), the postal worker (Martinez), and the United States, which appeared on behalf of the postal worker.[1] Defendants conceded negligence, and the following evidence was presented during a joint bench and jury trial on damages held June 11-14, 2001. The claims against the United States were tried to Magistrate Judge Mann pursuant to 28 U.S.C. § 636(c)(1), under the Federal Tort Claims Act, see 28 U.S.C. §§ 1346(b)(1), 2402, while the claims against Hernandez were tried to the jury.
 
 
 7
 Immediately following the accident, Presley was rushed to Brooklyn Hospital and Medical Center and underwent a two and a half hour surgery for the telescoping injury to her nose. Presley lost cartilage and bone in her nose, and a priest was called to her bedside because the doctors feared that the missing bone pieces might have become lodged in her brain. Dr. Ines Carrasquillo, the plastic surgeon who supervised Presley's original surgery and then examined her a week after the surgery, testified at trial that after the surgery, Presley's nose was swollen and scarred but was essentially healing well.
 
 
 8
 It was undisputed at trial, however, that Presley's nasal configuration had been permanently affected by the accident, surgery, and resulting scarring. Dr. Carrasquillo recommended that Presley undergo two additional operations: a rhinoplasty to alleviate her breathing difficulty, and a scar revision for cosmetic purposes. Dr. Carrasquillo testified that while she could not give Presley the nose she had before the accident, with surgery, "[w]e could give her a good result. We can address what she's complaining about now." Finally, Dr. Carrasquillo explained that the risk of complications resulting from the surgery was low, but was "higher than if she had not had any trauma to her nose. So, it may be five percent."
 
 
 9
 Contradictory testimony was presented regarding whether the scarring and subsequent deformation interfered with Presley's breathing or her pre-existing asthma. Presley testified on direct examination that, due to the injuries, she could no longer breathe through one nostril and that during an asthma attack, "[i]t is terrifying because I am basically breathing — it is impossible to breathe." On cross-examination, however, defense counsel elicited that Presley had previously testified during her deposition that, since January 1999, her asthma had not "been exacerbated in any way by anything [she] attribute[s] to this accident" and that "[t]he injury to the nose as a result of the accident [has not] caused any problems in breathing."
 
 
 10
 In addition to her facial injuries, Presley also claimed that several weeks after the accident she began to experience back and neck pain as a result of the collision. Presley claimed to be severely limited by this pain such that interacting with her young son was painful and exhausting, and even performing routine tasks such as carrying groceries was difficult. Presley explained that she had both good and bad days with respect to her neck and back pain, but a subsequent pregnancy exacerbated the injury: "[W]here I used to have — it would run the gamut during a week prior to me being pregnant I now have a good day maybe, maybe a few times a month." Presley also claimed that the pain from the accident had interfered with her ability to sleep, causing her to awaken three to four times nightly.
 
 
 11
 According to Presley's testimony, she first consulted with Dr. Robert Black for her back and neck pain several months after the accident. Dr. Black allegedly referred her to Dr. David Payne for an MRI in June 1996. Although no treatment records from Dr. Black were introduced at trial, Presley presented documentary evidence indicating that an MRI of her cervical spine was performed by Dr. Payne on June 19, 1996, on referral from Dr. Black. According to Dr. Payne's report analyzing the MRI, Presley had three disc bulges on her cervical spine as well as some straightening of the cervical spinal curve.
 
 
 12
 Beginning in December 1996, Presley sought treatment with Dr. Denise Fernandez, a chiropractor with the Alea Medical Center. Treatment progress notes from 1997 through 1999 indicate that Presley repeatedly complained of back and neck pain, and that her treating doctors at the Alea Medical Center found tenderness in her bilateral cervical paraspinal regions, and a limited cervical spine range of motion. Presley was diagnosed with, inter alia, lumbar myalgia, cervical myalgia, and fibromyalgia, and she underwent unsuccessful treatments including physical therapy, manipulation of her vertebrae, trigger point injections directly into her muscles, and acupuncture. Presley discontinued treatment with Dr. Fernandez and the Alea Medical Center in September 1999 when Dr. Fernandez moved to Connecticut. While Presley testified that she was still receiving treatment as of the time of trial in June 2001, she did not introduce into evidence any records of treatment more recent than September 1999.
 
 
 13
 The government's expert radiologist, Dr. Sunil Trasi, testified based on his review of the MRI films that Presley did not have any herniated discs or disc bulges. He also testified, in response to questions on cross-examination, that disc bulges were not caused by trauma but rather resulted from age and deterioration. In addition, the government's expert neurologist, Dr. Robert Goldberg, testified that when he examined Presley in September 1999, he found no evidence of nerve damage or muscle weakness. With respect to Presley's cervical spine, he found that she had normal curvature and any limitations to her range of motion were voluntary. In August 2000, Dr. Goldberg again examined Presley and again found voluntary limitations, this time with reports of pain accompanying the movement. As a result of his examinations, Dr. Goldberg concluded that Presley "had sustained a soft tissue injury to the cervical and lumbar spine but the injury was without functional deficit, motion restriction, weakness or motor loss or that there was no disc herniation or nerve damage as a result." Dr. Goldberg did not make a finding of fibromyalgia.
 
 
 14
 In contrast, Presley's expert neurologist, Dr. Jerome Block, testified that he found some neural damage to the C-8 and S-1 nerve roots based on Presley's dullness-of-sensation responses to stimuli in particular areas of her body. None of Presley's treating physicians had made similar findings. Dr. Block also testified about the MRI report, noting that Dr. Payne had found disc bulges or protrusions and that the spinal curvature was somewhat straightened. In addition, Dr. Block found, based on his own examination of Presley, that she had a limited range of neck motion and lumbar flexibility due to pain. Consistent with the findings of the treating providers from the Alea Medical Center, Dr. Block determined that Presley had muscle pain problems, including lumbar myalgia.
 
 II. The Jury's Verdict
 
 15
 On June 14, 2001, the jury returned a verdict against Hernandez, the livery cab driver, for $1,795,000. It included $550,000 for past pain and suffering for damage to Presley's nose and face, $400,000 for future pain and suffering for damage to the nose and face, $300,000 for past pain and suffering for neck damage, $210,000 for future pain and suffering for neck damage, $190,000 for past pain and suffering for back injuries, and $145,000 for future pain and suffering for back injuries. After the verdict was returned, Hernandez made an oral motion to set aside the judgment as against the weight of the evidence and as excessive. Magistrate Judge Mann took the motion under advisement but made no explicit ruling on it.
 
 III. The Bench Ruling
 
 16
 On April 30, 2002, Magistrate Judge Mann issued a thorough Memorandum and Order directing that judgment for all injuries be entered against the United States in the amounts of $290,000 for past pain and suffering and $125,000 for future pain and suffering. Specifically, she awarded $250,000 for past pain and suffering and $125,000 for future pain and suffering for Presley's facial injuries. With respect to the neck and back injuries, the court found that Presley had exaggerated the extent of her injuries and that she had sustained only $40,000 in damages for past pain and suffering, with no future damages.[2] Magistrate Judge Mann also found that "[b]ased upon the deposition testimony of the two drivers (neither of whom testified at trial) ... Hernandez was 55% at fault and the United States was 45% at fault" because Hernandez, the livery cab driver, had started his shift at 6:00 the previous evening and was therefore fatigued.[3]
 
 
 17
 An amended judgment was entered on May 24, 2002, reflecting the jury's award of $1,795,000 against Hernandez and Magistrate Judge Mann's bench verdict against the United States for $415,000.
 
 
 18
 On appeal, Presley requests that we vacate the magistrate judge's award of damages against the United States, remand for further consideration of the issue of damages, and mandate a new trial unless the United States agrees to a significant additur. On cross-appeal, Hernandez seeks vacatur of the portion of the amended judgment awarding $1,795,000 against him, arguing that the magistrate judge abused her discretion in not explicitly ruling on his motion for new trial or remittitur.
 
 DISCUSSION
 
 19
 I. Hernandez's Cross-Appeal of the Jury's Damages Award
 
 
 20
 The parties agree that because Presley's negligence claim against Hernandez is governed by New York law, the motion for a new trial should have been granted if the award is excessive in that it "deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c). In applying this standard, a district court reviews the evidence presented at trial in support of the challenged damage award and compares the award to other New York cases in which evidence of similar injuries was presented. Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 437-39, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). We then review the denial of the motion for a new trial for abuse of discretion. Id. at 432-39, 116 S.Ct. 2211; Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir.1998).
 
 
 21
 Hernandez argues that the magistrate judge abused her discretion in failing to explicitly rule on his oral motion for a new trial under Fed.R.Civ.P. 59 made after the return of the jury's verdict on June 14, 2001, and hypothesizes that the court was unaware that the motion was still pending at the time it ruled on the bench trial almost a year later or at the time it issued the amended judgment. Presley, in turn, contends that the court implicitly denied the motion by entering the amended judgment ordering Hernandez to pay the full amount awarded by the jury.
 
 
 22
 While a written explanation of a district court's basis for denying a Rule 59 motion is certainly preferable as an aid to appellate review, a separate written opinion is not necessarily required when a district court denies a Rule 59 motion for a new trial. See, e.g., Copper v. City of Fargo, 184 F.3d 994, 998 (8th Cir.1999) (per curiam) (holding that no separate, written order is required when a district court denies a motion for a new trial under Rule 59 because the denial leaves the original judgment intact); Marre v. United States, 38 F.3d 823, 825 (5th Cir.1994) (same); Wright v. Preferred Research, Inc., 937 F.2d 1556, 1560 (11th Cir.1991) (same). If a district court enters a judgment in the full amount of the jury's verdict after a motion for new trial has been filed without issuing a separate order, we assume that the court implicitly had denied the motion and we would affirm absent evidence that would compel our conclusion that a trial judge had exceeded allowable discretion in not concluding that the verdict was excessive. Here, however, the difference between the damages awarded by the jury against Hernandez and by the magistrate judge against the United States — for what are undisputedly the same injuries — is so substantial as to give us pause before concluding that any implicit holding that the jury's verdict was not excessive is not an abuse of discretion. Under such circumstances, the magistrate judge should make explicit the basis for her denial of the new trial motion to permit meaningful appellate review. Cf. In re Bolar Pharm. Co. Sec. Litig., 966 F.2d 731, 732 (2d Cir.1992) (per curiam) ("If we are to be satisfied that a district court has properly exercised its discretion, we must be informed by the record of why the district court acted as it did.").
 
 
 23
 A number of rationales might explain the magistrate judge's decisions here.[4] For example, the court might have believed that the issue of damages turned on Presley's credibility, and determined that while sitting as a trier of fact it found her claims of injuries to be exaggerated, the jury nonetheless was entitled to credit Presley's account of her injuries. If the magistrate judge then concluded that $1,795,000 did not deviate materially from what would be reasonable compensation if Presley's version of her injuries were credited, it might have upheld the jury verdict against Hernandez. Alternatively, the court might have found that the range of reasonable compensation for Presley's alleged injuries was so wide as to permit recovery of $1,795,000 while not foreclosing an award of only $415,000. Finally, given the lapse of time between defendant's oral motion for remittitur and the ruling on the bench trial, and the absence of any indication that the oral motion was docketed, the magistrate judge may have, as Hernandez suggests, overlooked the pending motion when the amended judgment was entered on May 24, 2002.
 
 
 24
 These possibilities, however, are speculative. Because the amount awarded by the jury against Hernandez differs so significantly from the amount awarded by the magistrate judge against the United States, and because we cannot ascertain the basis for the magistrate judge's implicit finding that the jury award was not excessive, we vacate the judgment against Hernandez and remand for reconsideration of the Rule 59 motion.[5]
 
 
 25
 II. Presley's Appeal of the Court's Damages Award
 
 
 26
 A district court's findings of fact in support of its verdict, "whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a). "[A] finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)) (internal quotation marks omitted). Applying this standard, we turn to Presley's arguments that the damages award against the United States is clearly erroneous.
 
 
 A. The "Advisory" Jury Verdict
 
 
 27
 First, although Presley correctly notes the magistrate judge was not bound by the jury's determination against a non-governmental defendant in assessing claims against the United States under the Federal Tort Claims Act, she argues that the jury's findings must mean "something," because "[b]asic tenets of statutory construction dictate that Congress would not have utilized the term `advisory' if it had intended the jury findings to be irrelevant." Brief for Appellant at 27. Following this logic, Presley argues that the court improperly ignored the advisory nature of the jury findings in awarding only $415,000 in damages against the United States while at the same time implicitly upholding the $1,795,000 verdict as reasonable compensation.
 
 
 28
 The statutory language of the Federal Tort Claims Act, however, nowhere uses the word "advisory." See 28 U.S.C. §§ 1346(b)(1), 2402. Instead, § 2402 simply provides, with an exception not relevant here, that "[a]ny action against the United States under section 1346 shall be tried by the court without a jury ...." Accordingly, the court below acted properly in making its own independent findings of fact and conclusions of law. See Gallardo v. United States, 697 F.Supp. 1243, 1245 n. 1 (E.D.N.Y.1988) (noting in an FTCA case that "[t]he verdict of the jury was, at best advisory. The responsibility for decision remains with the court which has discretion whether to accept or reject the jury's verdict."); cf. Matthews v. CTI Container Transp. Int'l Inc., 871 F.2d 270, 279 (2d Cir.1989) (applying the same standard in an FSIA case, and holding that the trial judge was not bound by the jury's findings in its simultaneous bench trial against a foreign sovereign).
 
 
 29
 Further, the court's roles when conducting a bench trial and in reviewing a jury's verdict under C.P.L.R. § 5501(c) are distinct. Under the former, the trial judge must use his or her own judgment to determine an appropriate award; under the latter, the judge must determine whether the verdict "deviates materially from what would be reasonable compensation." C.P.L.R. § 5501(c); see also Gasperini, 518 U.S. at 437-38, 116 S.Ct. 2211 (holding that in considering a claim based on New York law, a federal district court is to apply § 5501(c) to assess whether a jury verdict is excessive). Because of these different standards, the difference between the jury's award and the magistrate judge's does not alone render the magistrate judge's award clearly erroneous.[6]
 
 
 B. The Magistrate Judge's Factual Findings
 
 
 30
 Presley also alleges that the magistrate judge made clearly erroneous findings underlying the damages awards for the facial and the back and neck injuries. Because we conclude that there were several errors made in the findings of fact on the back and neck injuries, and we are concerned that these errors might well have influenced the magistrate judge's assessment of Presley's credibility and led to the conclusion that Presley was exaggerating the extent of her injuries, we vacate the judgment against the United States and remand for further consideration.
 
 
 31
 Relying exclusively on the testimony of Drs. Goldberg and Trasi, the magistrate judge concluded that
 
 
 32
 the medical evidence credited by this Court as fact-finder establishes that, to the extent plaintiff's lower back and neck were injured as a result of the 1995 accident, those injuries amounted to no more than temporary muscle spasms and soft tissue injuries; plaintiff suffered no neurological damage, fibromyalgia, disc bulges, herniations, protrusions or other permanent spinal injuries attributable to the 1995 accident.
 
 
 33
 Concluding that Presley had exaggerated her injuries, the court awarded only $40,000 in past pain and suffering and no future pain and suffering for the back and neck damages. With respect to Presley's facial injuries, the court found that Presley "has only minimal scarring and slight nasal occlusion. While both can be addressed by future surgery, some scarring is permanent and the shape of plaintiff's nose has been permanently altered." The magistrate judge awarded Presley $250,000 for past pain and suffering and $125,000 for future pain and suffering, an amount less than half that awarded by the jury against Hernandez for these injuries.
 
 
 34
 The magistrate judge's findings of fact on Presley's neck and back injuries begin with the observation that while Presley claimed to have experienced pain after the accident and sought treatment from Dr. Black of PIMM Medical Group several months after the accident, "[n]otably, she had made no complaints of back or neck pain at Brooklyn Hospital ... and plaintiff offered no records from PIMM or any other corroboration of her alleged treatment by Dr. Black." The June 19, 1996 MRI report, however, demonstrates that Presley had been referred to Dr. Payne by Dr. Black for an MRI of the back sometime before June 19, 1996, and corroborates her testimony that she saw Dr. Black.
 
 
 35
 If, as appears, the Magistrate Judge doubted that Presley was credible in stating that she was treated by Dr. Black, a misimpression on this score might well have cast unwarranted doubt on Presley's testimony as to the extent of her injuries." Most explicitly, in suggesting that Dr. Fernandez's testimony that Presley's neck and back injuries were the sequelae of the November 1995 accident lacked credibility, the magistrate judge again observed that "[t]his opinion is difficult to reconcile with the totality of the evidence, especially plaintiff's delay in seeking medical attention for her back and neck, and her statement to Dr. Norma Bilbool[, a physiatrist with the Alea Medical Center,] that her low back pain was brought on by stress at work (emphasis added)." Accordingly, it appears that the magistrate judge discredited Presley's treating chiropractor's opinion based in part on the mistaken belief that Presley had not sought treatment for over a year after the accident.
 
 
 36
 We additionally note that Presley's statement to Dr. Bilbool that her lower back pain was brought on by stress at work, also relied on by the magistrate judge, appears to have been taken out of context by both the court and defendant's expert, Dr. Goldberg. In an examination report dated March 17, 1997, Dr. Bilbool noted:
 
 
 37
 The patient is a 28 year-old female status post a motor vehicle accident on 11/15/95, as a result of which she sustained injuries to her neck and low back. The patient comes in today stating that her neck pain is no better, however, it is worsened by stress. She says she can feel her muscles tighten. She has a lot of stress at work at present and is about to leave her job within the next week. Her headaches, however, have improved.... A week ago, the patient experienced low back pain for two days which she thinks was brought on by aggravation and stress at work.
 
 
 38
 Thus, this notation, consistent with other treatment records from the Alea Medical Center, indicates that Presley attributed her neck and lower back injuries to the accident, and was merely explaining that stress worsened her pain.
 
 
 39
 Further, in explaining the basis for the conclusion that the accident would cause Presley no future pain and suffering with respect to any back and neck injuries, the magistrate judge relied on the fact that "[a]ccording to the medical records, the last medical treatment that plaintiff received for her neck and back injuries occurred in December 1998, with physical therapy until January 1999." The magistrate judge had previously noted in her findings of fact, however, that Dr. Fernandez had testified that she treated Presley in September 1999,[7] and Presley had testified at trial that she was still receiving treatment as of the time of trial, June 2001. See Presley Tr. at 341 ("Q: Without going into any details, do you still get treatment for your back? A: Yes."). While we are sympathetic to the difficulty caused by Presley's failure to introduce medical records supporting some of this treatment, the magistrate judge's evident doubts about Presley's claim of continued treatment, and refusal to award damages for future pain and suffering for back and neck pain, might have resulted from unwarranted doubts about Presley's claim of treatment by Dr. Black. Moreover, it is evident that Presley's credibility — or doubts concerning it — was critical to the magistrate judge's ultimate conclusion that "plaintiff has exaggerated the symptoms and pain that she suffered as a result of the accident." Thus, what appear to have been unwarranted doubts about certain aspects of Presley's testimony may have led to an undue depreciation of her credibility and affected the ultimate damages award.
 
 
 40
 Several of the magistrate judge's other findings of fact also may warrant reconsideration on remand. For example, in discussing the treatment records from the Alea Medical Center, the judge observed that "[n]one of the Alea records disclosed evidence of radicular pain, reflex changes, atrophy or numbness.... There were, however, objective indications of muscle spasm." In so concluding, the court may have overlooked the fact that Dr. Bilbool had found, through a number of different tests, that Presley had suffered nerve damage in her neck and back, resulting in increased sensitivity in some areas and reduced sensitivity in others.
 
 
 41
 Finally, with respect to the damages award for past and future pain and suffering caused by the facial injuries, Presley argues that the magistrate judge erred in failing to calculate her damages with reference to her occupation as a topless dancer, model and aspiring actress, and contends that even if she remains "very attractive," the lack of reference to her career in the bench ruling evidences a lack of appreciation of the magnitude of her injuries. Presley has not identified anything in the record to support the inference she seeks — that is, that the injuries did interfere with her occupation.[8] Nonetheless, we are concerned that the specific factual errors previously identified might have had some effect on the magistrate judge's calculation of damages attributable to Presley's facial injuries. We therefore believe that further consideration of Presley's past and future facial injuries is also warranted on remand.
 
 
 42
 In summary, because we are concerned that the identified erroneous factual findings may have influenced the magistrate judge's decision on Presley's damages, we vacate the damages award against the United States and remand for reconsideration. In remanding, we seek clarification and either correction of what appear to be some mischaracterizations or assurance that they have not affected the ultimate damages award. We emphasize that the ultimate decision as to all witnesses' credibility and as to the persuasive force of their testimony is for the trier of fact, as is the ultimate determination of damages, subject only to the outer limits of reasonableness.
 
 CONCLUSION
 
 43
 For the foregoing reasons, we vacate the judgment against Hernandez and remand for reconsideration of Hernandez's Rule 59 motion. We also vacate the damages award against the United States and remand for further consideration of Presley's claim against the United States.
 
 
 
 Notes:
 
 
 [1]
 The claims were dismissed as to GSA N.Y. Fleet Management Center
 
 
 [2]
 The court's awards compare to the jury's as follows:
 Jury Court
Nose and face, past pain
 and suffering: $550,000 $250,000
Nose and face, future pain
 and suffering: $400,000 $125,000
Neck and back, past pain
 and suffering: $490,000 $ 40,000
Neck and back, future pain
 and suffering: $355,000 $ 0
 
 
 [3]
 While Presley's brief had argued that this finding on apportionment was clearly erroneous, her counsel clarified at oral argument that the apportionment finding was not challenged on appeal
 
 
 [4]
 We advance this non-exhaustive list only to provide theoretical explanations for the entry of judgment in widely differing amounts against Hernandez and the United States and do not intend any restriction on the approach that should be followed on remand
 
 
 [5]
 We also note that it would have been preferable for Hernandez to make his Rule 59 motion in writing to assist the magistrate judge in the task of comparing the jury's verdict with the comparable New York caselaw. "[I]t is ordinarily a better practice to wait until the entry of judgment and serve a written motion, stating with particularity the substantive grounds and the relief sought by the motion. A written motion avoids any problem as to the validity of an oral motion, whether counsel has assigned grounds for the motion, and whether the subsequent entry of the judgment was an implied denial of the motion made before the entry of the judgment." 12 Moore's Federal Practice § 59.10[1] (Matthew Bender 3d ed.2002). We recognize here, however, that the magistrate judge had before her extensive briefing from the United States and Presley on New York caselaw on damages for purposes of the bench trial and did not indicate to Hernandez at the time the oral motion was made that further briefing would be required. On remand, the court is free to request briefing from the parties on the Rule 59 motion
 
 
 [6]
 While we do not find the purportedly "advisory" nature of the jury's verdict to be a basis to disturb the bench verdict, we do note that to the extent that the entry of the amended judgment was intended to deny Hernandez's motion for new trial, the significant but unexplained difference between the jury's award and the bench verdict is somewhat troubling
 
 
 [7]
 There is also a narrative treatment report from Dr. Hernandez dated September 22, 1999, which describes Presley's condition, including her limited range of motion
 
 
 [8]
 We also reject Presley's contention that the magistrate judge impermissibly relied on the fact that Presley could use cosmetics to mask her deformity to find that her damages were mitigated. The passage cited by Presley from the opinion below makes clear that the court found that "[e]ven without further surgery, plaintiff, who wore no make-up during trial, showed minimal scarring and presented as a very attractive 33-year old woman, whose appearance could be further enhanced with makeup and/or additional surgery." Thus, the court's factual finding was that without the further surgeries Presley's doctor had testified might reduce the appearance of the deformity and without using makeup, Presley was still a "very attractive woman."