## In re ENGLE PROGENY CASES.

Case No. 3:09–CV–10000–WGJ–JBT.

United States District Court,
E.D. New York,
Jacksonville Division.

Signed Oct. 20, 2014.

---

### MEMORANDUM AND ORDER

FREDERIC BLOCK, District Judge:

The jury in this *Engle* progeny action awarded the plaintiff, William Harford, $160,000 in lost wages and $170,000 in medical expenses, but made no award for pain and suffering. It further found Harford 82% at fault for his injuries, which would have resulted in a judgment of $59,400.

The Court ordered the parties to mediation, which was unsuccessful. Harford then moved for a new trial. For the following reasons, the Court concludes that the jury's failure to award any noneconomic damages was against the great weight of the evidence and, accordingly, orders a new trial on damages only.

### I

The jury found that Harford suffered from lung cancer caused by an addiction to cigarettes manufactured by R.J. Reynolds Tobacco Co. ("Reynolds"). The following facts are set forth with those findings in mind.

Harford began regularly smoking cigarettes in 1951, at the age of 19. After forty years, he began to experience severe coughing fits and shortness of breath. When Harford also began coughing up

blood, his primary care physician ordered a chest x-ray and referred him to Dr. Edward Scanlon. The x-ray and a subsequent CAT scan revealed a nine-centimeter mass in Harford's left lung. The mass was biopsied and found to be malignant. Dr. Scanlon diagnosed the mass as adenocarcinoma. Because the cancer was advanced and inoperable, Dr. Scanlon gave Harford a poor prognosis, opining that he had, statistically, several months to a year to live.

Unsurprisingly, Harford testified that the diagnosis was devastating:

> We [Harford and his wife] just sat there with our hands holding and not a word was said all the way home. We got home and got into the house, we just—pardon me, sir. I'm sorry, Your Honor. We embraced each other, and we broke down and we cried together.

Trial. Tr. (Jan. 21, 2014) at 78. Sharing the news with his daughter and granddaughter was "one of the most saddest days and depressing days of [his] life." *Id.* at 79. Harford and his wife made plans for her to live with their daughter in Cleveland after his death and, in anticipation, put their house on the market. Harford also quit his job as a salesman. At Dr. Scanlon's recommendation, Harford underwent a total of 39 daily radiation treatments. Harford testified that the treatments took a physical and emotional toll:

> My wife would wait out into the waiting room. And whenever they'd come out to get me to take me back, she would break into a cry. And when I left her—that's how I left her. And that made me feel awfully bad to see her—to have to walk away from her with her crying.
>
> \*     \*     \*
>
> [The radiation treatments made me v]ery, very tired. They took almost all the energy that I had in my body. That was the only symptom that I had was just extreme tiredness. When I got home from each application, the first thing I would do is just go in and fall across the bed. And that's where I spent most of the day and night.

*Id.* at 82–83. He lost between eighteen and twenty pounds during the treatment. In addition, his granddaughter testified that he continued to cough up blood and described his emotional state as a combination of "fear, anxiety and stress and sadness." Trial Tr. (Jan. 22, 2014) at 98.

Although radiation therapy had been prescribed principally as a palliative measure, Harford's tumor began—against all expectations—to shrink. He was eventually told the cancer was in remission. He and his wife purchased a new house in 1993 and he got a new job in 1996. Harford quit smoking following his initial diagnosis and has had no further smoking-related health problems. However, the radiation left extensive scar tissue on Harford's left lung. In addition, he continues to get periodic chest x-rays and, although he has never taken any anti-anxiety or anti-depression medication, he has a persistent fear that the cancer might return.

## II

Federal Rule of Civil Procedure 59(a)(1)(A) empowers a district court to grant a new trial "on all or some of the issues" "for any reason for which a new trial has heretofore been granted in an action at law." It is well-established that a verdict against the great weight of the evidence is grounds for a new trial. *See Lipphardt v. Durango Steakhouse, Inc.,* 267 F.3d 1183, 1186 (11th Cir.2001) ("A judge should grant a motion for a new trial when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there

may be substantial evidence which would prevent the direction of a verdict." (internal quotation marks and citation omitted)).

■ Although the authority to order a new trial comes from the Federal Rules of Civil Procedure, "[a] federal court reviewing a compensatory award on a state law claim must evaluate the propriety of the award under state law." *Myers v. Central Fla. Invs., Inc.*, 592 F.3d 1201, 1212 (11th Cir.2010) (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 435, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996)). In *Allstate Insurance Co. v. Manassee*, 707 So.2d 1110 (Fla.1998), the Florida Supreme Court held that an award of *future* medical expenses without a corresponding award of noneconomic damages was not inadequate as a matter of law. *See id.* at 1112. It further noted, however, that "future damages are, by nature, less certain than past damages":

> A jury knows for a fact that a plaintiff has incurred past medical expenses, and, when it finds those expenses to have been caused by the accident, there is generally something wrong when it awards nothing for past pain and suffering. The need for future medical expenses is often in dispute, however, as it was here. It does not necessarily therefore follow ... that an award of future medical expenses requires an award of noneconomic damages.

*Id.* at 1111–12 (quoting *Allstate Ins. Co. v. Manasse*, 681 So.2d 779, 784–85 (Fla. 4th DCA 1996) (Klein, J., dissenting)).

■ As Harford points out, his claim for noneconomic damages "was focused primarily on the physical pain and mental anguish associated with his cancer diagno-

sis, treatment, and resulting inability to work for the four years after his diagnosis." Pl.'s Mem. of Law at 10 n. 1. Perhaps unsurprisingly, the parties have very different views of how the Florida Supreme Court's comment in *Manasse* should play out on such a claim.

Harford argues, in essence, that an award of past medical expenses *requires* an award of noneconomic damages. Reynolds argues that a jury's failure to award noneconomic damages can *never* be the basis for a new trial *unless* causation and the existence of pain and suffering are entirely undisputed.[1]

Both positions find at least some support in the case law. *Compare, e.g., Allstate Ins. Co. v. Campbell*, 842 So.2d 1031, 1034–35 (Fla. 2d DCA 2003) ("Since the jury found that the Campbells suffered injuries that required treatment by medical care providers as evidenced by the award of past medical costs, the jury's failure to award even nominal past noneconomic damages was not supported by the weight of the evidence and must be reversed."), *with Beauvais v. Edell*, 760 So.2d 262, 264 (Fla. 4th DCA 2000) ("[W]here there is a dispute as to whether the injuries resulted from the accident, a verdict awarding only [past] medical expenses does not require a new trial as a matter of law.") (en banc). Read as a whole, however, that case law demonstrates a recognition that the question of whether a divergence between past economic and noneconomic damages warrants a new trial is a matter better handled by an exercise of the trial court's discretion than by *per se* rules:

---

1. Reynolds further argues that it must be undisputed that the plaintiff suffered a *permanent* injury. The cases it cites, however, all involved automobile accidents. Under Florida's no-fault insurance law, proof of a perma-

nent injury is a prerequisite to the recovery of noneconomic damages. *See* Fla. Stat. § 627.737(2). There is no analogous requirement in any other type of case.

When a motion for new trial is made it is directed to the sound, broad discretion of the trial judge, who because of his contact with the trial and his observation of the behavior of those upon whose testimony the finding of fact must be based is better positioned than any other one person fully to comprehend the processes by which the ultimate decision of the triers of fact, the jurors, is reached.

*Manasse*, 707 So.2d at 1111 (quoting *Cloud v. Fallis*, 110 So.2d 669, 673 (Fla.1959)); *see also Beauvais*, 760 So.2d at 264–65 ("[A] motion directed to the inadequacy, whether it seeks a[n] additur or a new trial, is left to the broad discretion of the trial judge.").

The Court exercises its discretion in favor of a new trial. Although Reynolds offered evidence that Harford suffered from a different type of cancer, the jury found that it was adenocarcinoma. More importantly, it found that the illness—whatever it's precise nature—was caused by an addiction to cigarettes for which Reynolds was at least partially to blame.

Reynolds further argues, and Harford essentially concedes, that the evidence reflects that Harford's cancer has long been in remission. While that is certainly true, there can be no serious doubt that Harford suffered pain and suffering as a result of his cancer: the discomfort of coughing up blood, the stress and fear of being diagnosed with a terminal illness, and the fatigue associated with radiation treatment.

Apart from the merits, Reynolds offers two reasons why Harford's motion for a new trial should be denied. The Court finds neither persuasive.

■ First, Reynolds argues that Harford waived any objection to the jury's verdict by failing to raise the objection before the jury was discharged. In making this argument, Reynolds characterizes Harford's objection as a claim that the verdict was inconsistent.

The law in this area is unsettled. Florida courts have consistently described claims like Harford's as challenges to the *adequacy* of the verdict. *See Ellender v. Bricker*, 967 So.2d 1088, 1091 (Fla. 2d DCA 2007) ("Based on the pertinent case law, we conclude that Ellender's argument constitutes a claim that the verdict was inadequate and that the issue therefore was properly preserved by his posttrial motion."). By contrast, in *Coralluzzo v. Education Management Corporation*, 86 F.3d 185 (11th Cir.1996), the Eleventh Circuit affirmed the denial of a motion for a new trial—"which was grounded on the failure of the jury to award damages for indisputable pain and suffering and loss of consortium"—"on the ground that the plaintiffs failed to object to the jury verdict at the time it was returned and did not request that the damages issue be resubmitted so that the jury could remedy the legal defect before it was discharged." *Id.* at 186. There is, however, no binding precedent as to whether the characterization of a verdict as inconsistent or inadequate is a question of state or federal law in diversity cases. *See Denton .v. R.J. Reynolds Tobacco Co.*, 985 F.Supp.2d 1331, 1338 (M.D.Fla.2013) ("Although the Eleventh Circuit has not spoken on the issue, the Sixth Circuit has held that in diversity cases, federal law supplies the procedure for addressing an inconsistent verdict and state law determines whether the verdict is inconsistent.").

■ The Court sidesteps this legal quagmire by invoking its discretion to excuse Harford's failure to object:

[A] trial court, upon discovering such an inconsistency, has the option of either (1) directing entry of judgment on the special verdicts, notwithstanding the inconsistent general verdict; (2) returning

the jury for further deliberations; or (3) ordering a new trial ... The principal limitation on the court's discretion is that it "must be exercised in light of the circumstances under which the inconsistency arises."

*Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1199 (11th Cir.2004) (citing and quoting *Phillips Chem. Co. v. Hulbert*, 301 F.2d 747, 751 (5th Cir.1962)); *see also Coralluzzo*, 86 F.3d at 186 ("[I]t was clearly *within the district court's discretion* to deny the motion for a new trial based on the ground that the zero verdicts were improper." (emphasis added)). There is good reason to do so in this case. As noted, it is not clear that an objection was required. Moreover, the Court excused the jury immediately after taking the verdict, and before discussing potential problems with counsel; during that colloquy, Harford's counsel promptly raised his "concerns about the last bodily injury finding, the personal pain and suffering component." Trial Tr. (Jan. 27, 2014) at 21. Finally, the point of requiring a contemporaneous objection is "to allow the original jury to eliminate any inconsistencies without the need to present the evidence to a new jury." *Coralluzzo*, 86 F.3d at 186. In the circumstances, that would have amounted to instructing the jury that its award of medical expenses *mandated* an award for pain and suffering, contrary to the Court's conclusion *supra* that there is no such rule under Florida law.

Second, Reynolds argues that the jury's award of $170,000 in medical expenses renders its failure to award any noneconomic damages harmless. The award of $170,000 is indeed mysterious. Harford's counsel asked for only $35,000 in medical expenses; although he mentioned medical records reflecting additional expenses in a colloquy with the Court, *see* Trial Tr. (Jan. 21, 2014) at 242, he has not included the specific records with his motion for a new trial.

It is possible, then, that the jury combined both medical expenses and noneconomic damages into a single item on the verdict form. However, it is also possible that the jury took some improper factor—most notably, Harford's comparative fault—into account. In either case, the jury failed to follow the Court's instructions.

Although the possibility suggested by Reynolds does not warrant denying Harford's motion outright, it does bear on the scope of the new trial. The issue of damages is sufficiency discrete to satisfy the Court that the jury's failure to award noneconomic damages does not impugn any of its findings with respect to liability. In other circumstances, it might even be appropriate to limit the new trial to noneconomic damages only. Because, however, there is a possibility that the jury's award of medical expenses (inappropriately) included noneconomic damages, confining the new trial to noneconomic damages only would run the risk of allowing a double recovery. Accordingly, the new trial will cover all damages.

**SO ORDERED.**